PEQUIGNOT *v.* CITY OF DETROIT.

*(Circuit Court, E. D. Michigan.* May 21, 1883.)

1. "CROSSWALK"—"SIDEWALK."

    A walk crossing a public alley is a "crosswalk," as distinguished from a "sidewalk."

2. ALIENAGE—MARRIAGE.

    An alien woman who has once become an American citizen by operation of law, viz., by a marriage, which is subsequently dissolved, may resume her alienage by a marriage to an unnaturalized native of her own country.

3. CITIZENSHIP—RESIDENCE PRIMA FACIE EVIDENCE OF.

    Residence is only *prima facie* evidence of citizenship. Hence, where plaintiff, a native of France, came to this country in her childhood and was after-

wards married to an American citizen; this marriage was di solved, and she was again married to a native-born French citizen, it was held that she was an alien and competent to sue in the federal court, notwithstanding she and her husband continued to reside in this country.

On Motion for a New Trial.

The plaintiff brought suit against the city of Detroit to recover damages for personal injuries sustained by her, by reason of a defective walk across an alley which intersects Twenty-third street, between Fort and Lafayette. The plaintiff recovered a verdict, and defendant moved for a new trial upon the grounds stated in the opinion of the court.

*John D. Conely,* for plaintiff.

*Henry M. Duffield,* City Counselor, for defendant.

BROWN, J. The first error assigned by the defendant is based upon the ruling of the court, that the walk, upon which the plaintiff met her fall, was a crosswalk and not a sidewalk, within the meaning of the state act of 1879, No. 244. This act, which is entitled "An act for the collection of damages sustained by reason of defective public highways, streets, bridges, crosswalks, and culverts," creates a liability in favor of persons "sustaining bodily injury upon any of the public highways or streets in this state, by reason of neglect to keep such public highways or streets, and all bridges, crosswalks, and culverts in good repair."

We acquiesce in the opinion of the supreme court in *City of Detroit* v. *Putnam,* 45 Mich. 263, [S. C. 7 N. W. Rep. 815,] that this act does not include sidewalks. But we cannot perceive that this case has any bearing upon the question under consideration. We think the statute of 1879 was intended to distinguish between those portions of the streets which the city itself constructs and keeps in repair, and that other portion, viz., sidewalks, which it compels property-owners to build and keep in repair, rendering the city liable in one case and not in the other. Defendant's theory is that the alley begins at the outside of the sidewalk. But it seems quite clear that an alley, to be serviceable for the passage of teams, must begin at the curbstone, between the sidewalk and the street. Suppose, for instance, that the property-owners upon the opposite sides of an alley should extend fences across the intervening space. It is too plain for argument that they would be liable for obstructing the alley. Every crosswalk is, in one sense, a sidewalk, because it is an extension of the sidewalk proper across an intervening space; but it seems to us to make no difference whether it crosses a street or an alley. In

each case it crosses a highway for the passage of teams, and is a part of the street which the city itself builds and keeps in repair.

The main question in this case, however, relates to the alienage of the plaintiff, upon which new affidavits were offered upon this motion. The court charged upon the trial that as the plaintiff was a native of France, it did not sufficiently appear that she had ever become a citizen of the United States. The new affidavits show unequivocally that she at one time did become a citizen by marriage, but the question still remains to be determined whether at the time she brought this suit she was an alien or a citizen. Plaintiff was born in France, of French parents, who emigrated to this country when she was six or seven years old, but were never naturalized. In 1863 she was married to James Partridge, who was a native-born American citizen, and thereby under the act of February 10, 1855, (reproduced in the Revised Statutes, § 1994,) became a citizen of the United States. She lived with Partridge some 13 or 14 years, and was then divorced from him. Shortly thereafter she was married to Augustine Pequignot, who was himself born in France in 1835, and has never become an American citizen, or even declared his intention to do so. The plaintiff is still living in this state with him as his wife.

The case raises a novel and interesting question: whether an alien woman, who has once become an American citizen by operation of law, can resume her alienage by marriage to an alien husband. If we are bound by the case of *Shanks* v. *Dupont,* 3 Pet. 242, in its literalisms, then the plaintiff did not lose her citizenship by marrying a native of her own country, an alien. In that case, it was held that a native of Charleston, who married a British officer in 1781, during a temporary and hostile occupation of the city by the British, and subsequently went to England with him and remained there until her death, did not by such marriage cease to be a citizen of South Carolina, but that her withdrawal to England, and her permanent allegiance to the side of the enemies of the state down to the time of the treaty of peace in 1783, operated as a virtual dissolution of her allegiance. On page 246, the court briefly observes that the marriage with the British officer did not produce that effect, because the marriage with an alien, whether a friend or an enemy, produces no dissolution of the native allegiance of the wife; giving as its reasons for this ruling: (1) That no persons can, by any act of their own, without the consent of the government, put off their allegiance and become aliens; (2) if it were otherwise, then a *feme* alien would by

marriage become, *ipso facto*, a citizen, and would be dowable of the estate of her husband, which are clearly contrary to law.

Now, the general doctrine above stated, that no person can put off his allegiance without the consent of the government, is no longer the law in this country, since it is expressly declared by Rev. St. § 1999—

"That the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas, in the recognition of this principle, this government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas, it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the government thereof; and whereas, it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed : therefore, any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions the right of expatriation, is declared inconsistent with the fundamental rules of the republic."

The second reason, too, is no longer law, since, by the act of February 10, 1855, (Rev. St. § 1994,) "any woman who is now or may hereafter be married to a citizen of the United States, and who might herself be naturalized, shall be deemed a citizen." It seems to me, therefore, that we ought to apply the maxim "*cessante ratione, cessat lex*" to this case, and are not bound to treat it as controlling authority. It seems to me, too, that we should regard the sections above quoted as announcing the views of congress upon this branch of international law, and ought to apply the same rule of decision to a case where a female American citizen marries an alien husband, that we should to a case where an alien woman marries an American citizen.

It is satisfactory, though perhaps not important, to know that the French law upon this subject is the same as ours. In the Civil Code of France, book 1, tit. 1, § 12, it is declared that "a foreign woman who shall have married a Frenchman shall follow the condition of her husband;" and in England it is enacted by the sixteenth section of 7 & 8 Vict. c. 66, (1844,) "that any woman married, or who shall be married, to a natural-born subject or a person naturalized, shall be deemed and taken to be herself naturalized, and have all the rights and privileges of a natural-born subject." While I am unable to see how the law of France can fix the *status* of the plaintiff in this country, concurring in this respect with the opinion of Atty. Gen. Hoar, (13 Op. Atty. Gen. 91,) I see no reason why we should not apply the same law to wives of alien husbands in this country that

we do to American women marrying abroad. The fact that the French law corresponds with our own upon this subject, however, is an additional argument for the same application of the statute to citizens of both powers.

The only complication in this case is that the marriage took place and the parties reside in this country; but, while residence undoubtedly creates a presumption of citizenship, (*State* v. *Beackmo*, 6 Blackf. 488,) it is merely *prima facie* evidence, and may easily be rebutted. Suppose, for example, that an American citizen residing in France should marry a French woman, would she not thereby become an American citizen, and remain so though they continued to reside in France? There is no exception in the statute of marrying foreign women *and residing abroad*, and I know of no authority for interpolating one. It is true that section 1994 limits the right of any woman, marrying a citizen of the United States, to be deemed a citizen, to one "who might herself be lawfully naturalized," and it was at one time an open question whether the woman must not herself have resided within the United States for five years before she could be deemed an American citizen.

In *Burton* v. *Burton*, 1 Keyes, 359, the judges of the court of appeals of the court of New York seemed to be divided in opinion upon this point. Mr. Justice MULLEN (p. 362) says that "if a residence for five years was not a condition precedent to citizenship, residence for some length of time was most obviously contemplated." "Without residence she could not be naturalized, and it is the most essential of all the requirements for naturalization, and cannot be dispensed with, unless the intention to dispense with it is most clearly manifested by the legislature." Upon the other hand, Mr. Justice WRIGHT (p. 374) thought that the act did not require that the woman claiming its benefits should have resided within the United States; and, if it did, he thought the residence of the plaintiff was, by construction of law, the same as that of her husband. All doubt upon the construction to be placed upon the words, "who might herself be naturalized," was put at rest by the case of *Kelly* v. *Owen*, 7 Wall. 496, in which it was held that these terms only limited the application of the law to "free white women," inasmuch as the naturalization act existing at the time only required that a person applying for its benefits should be a "free white person," and not an alien enemy. Since this case was decided the provision has been still further restricted by section 2169, which admits aliens of African nativity and persons of African descent to

naturalization. This opinion, however, does not cover the case of residence abroad.

In an opinion of Atty. Gen. Williams, (14 Op. Atty. Gen. 402,) he held directly that an alien woman who has intermarried with a citizen of the United States residing abroad, the marriage having been solemnized abroad, and the parties after the marriage continuing to reside abroad, is to be regarded as a citizen of the United States within the meaning of said act, though she may not have resided within the United States. So, also, in an opinion delivered in 1869, Atty. Gen. Hoar decided that a woman born in the United States, but married to a citizen of France and domiciled there, was not "a citizen of the United States residing abroad," within the meaning of the internal-revenue law. It seems from the opinion that prior to this Atty. Gen. Stanbery had made a similar decision. Upon the contrary, Atty. Gen. Bates decided in 1862, (10 Op. Atty. Gen. 321,) that a woman born in this country, who married a Spanish subject residing here and then removed to Spain with her husband and child, and subsequently died there, was still an American citizen at her death. He held that the removal of the lady and her daughter to Spain, and their residence there, were no evidence of an attempt to expatriate themselves. I think it would be difficult to give any sound reason for this conclusion. Another case, almost precisely like the one under consideration, was decided by Atty. Gen. Taft (15 Op. Atty. Gen. 599) in favor of plaintiff's citizenship, upon the single authority of *Shanks* v. *Dupont,* 3 Pet. 342. These two cases are irreconcilable with the others, and are unsatisfactory to my mind. In *Kane* v. *McCarthy,* 63 N. C. 299, it was held that a woman who in 1857 had married in Ireland a naturalized citizen of the United States, could inherit property, although she had always resided in Ireland, and continued to do so until after descent cast.

It will be noticed that legislation upon the subject of naturalization is constantly advancing towards the idea that the husband, as the head of the family, is to be considered its political representative, at least for the purposes of citizenship, and that the wife and minor children owe their allegiance to the same sovereign power. The act of April, 1802, Rev. St. 2172, has declared that the minor children of naturalized persons should be considered as citizens of the United States. Then in 1804 (section 2168) it was enacted that if any alien has declared his intention of becoming a citizen, and dies before he is actually naturalized, his widow and children shall be considered

as citizens, upon taking the oath prescribed by law; and finally, by the act of 1855, Rev. St. § 1994, that an alien woman married to a citizen shall herself be deemed a citizen.

Now, if we concede that a French woman marrying an American citizen abroad thereby becames an American citizen, I see no reason why the same law should not be administered here; and whenever an American citizen, especially if she be originally a native citizen of France, marries a French citizen here, she should not be deemed and taken to be a citizen of the French republic. If she be an American citizen, it must be upon the theory, either that the *residence* of the wife is essential to citizenship, or that we should apply a different interpretation when an alien woman claims citizenship by operation of law from that applied where a native-born one claims expatriation by operation of the same law. Putting the converse of the case under consideration, suppose a native American woman were to go to Paris and marry a Frenchman. By the statutes of both countries she would thereby become a French citizen. But subsequently her husband dies, and she is married again to a native-born citizen of the United States residing in Paris. I think there would be little hesitation in holding that she was reinstated in her allegiance to her native land.

It is true that the law of France upon this subject has not been proved before us as a *fact*, but a copy of the Code Napoleon, purporting to issue from the publishing house of the council of state, at Paris, and bearing all the marks of authenticity, was produced and commented upon by counsel, without objection upon the hearing of this motion, and I think it is too late now to object to this evidence, although upon a trial before a jury it could not be received. The granting of new trials being largely matter of discretion, I would not decline to receive as the law of a foreign country that which could be proved as such by the mere authentication of a book.

Upon the whole case, then, I have come to the conclusion that plaintiff, being a native of France, and becoming a citizen of the United States by her first marriage, resumed her allegiance to her native country by marrying a French citizen, and is therefore an alien, entitled to bring this suit. The motion for a new trial must be denied.