(C. D. 538)

HOYT, SHEPSTON & SCIARONI *v*. UNITED STATES

United States Customs Court, Third Division

(Decided Oct. 1, 1941)

*Lawrence & Tuttle* (*George R. Tuttle* and *Charles F. Lawrence* of counsel) for the plaintiffs.

*Paul P. Rao*, Assistant Attorney General (*Richard F. Weeks*, special attorney), for the defendant.

Before CLINE and KEEFE, Judges

KEEFE, Judge: The plaintiffs here protest against the action of the collector at San Francisco in assessing duty on certain jewelry and watches. The importation was submitted for entry by the plaintiffs customhouse brokers, for Edith Livermore, the ultimate consignee, without invoice, and entry was made under regulations of the Secretary of the Treasury pursuant to section 498 of the Tariff Act of 1930, as the personal effects of citizens of the United States who died in a foreign country. The collector assessed duty thereon at the appropriate rates under the Tariff Act of 1930. The plaintiffs claim that the articles were the personal effects of one Lily Bredon, a citizen of the United States who died in a foreign country and, as such, are entitled to free entry under paragraph 1739, providing as follows:

PAR. 1739. Personal effects, not merchandise, of citizens of the United States dying in foreign countries.

At the trial on November 24, 1939, the case was submitted upon a stipulation between counsel made in open court. Afterwards, to wit, on a stipulation filed March 15, 1940, the case was reopened and an additional stipulation as to the date of the death of Robert E. Bredon, the husband of the deceased, was filed. Later, to wit, on May 2, 1940, a further stipulation was entered into as follows:

(1) The submission of this case heretofore entered into be set aside, and in lieu of the record hereinbefore made this stipulation may be deemed to be the record in this case, and upon this stipulation the case may be regarded as submitted, plaintiff's brief to be filed concurrently herewith and defendant's brief within 30 days hereafter.

(2) The articles covered by the protest consist of personal effects, not merchandise, *which belonged to Mrs. Lily Bredon and which at the time of her death were bequeathed by her to the plaintiff in this case, Miss Edith Livermore.*

(3) The said Mrs. Bredon was born in the United States in 1855; married Sir Robert E. Bredon, an English subject, in 1879, at San Francisco; emigrated to China, where she resided, with the exception of two visits to the United States, from 1879 until her death, which was in 1937.

(4) That Mrs. Bredon's husband died in 1917 or 1918, and Mrs. Bredon did not remarry. [Italics not quoted.]

The record is silent as to the person in whom title rested at the time of importation. The only reference thereto is that the articles *belonged* to Mrs. Lily Bredon and at the time of her death were bequeathed by her to Miss Edith Livermore. The record is likewise silent as to where the will of deceased was probated and the articles distributed thereunder. The appraisement entry states that "the articles are the bequest of a deceased relative."

There is nothing in the record to indicate that the imported articles were being brought to this country for distribution under the will of the said Lily Bredon. The inference from the record is that the will was probated under foreign laws and the articles came into the custody and control of the importer in a foreign country. Consequently, it is our opinion that such articles, brought to the United States after distribution of a foreign estate, would not have retained the status of personal effects of citizens dying in foreign countries.

There is nothing to show in the entry papers whether the collector found the goods dutiable because at the time of importation they were not the property of the estate of Lily Bredon, deceased, or whether he did not regard the deceased to be a citizen of the United States. Under the instructions to collectors published in T. D. 45917–2, the collector may allow free entry under paragraph 1739 of personal effects, not merchandise, the title to which at the time of importation is in the estate of a citizen of the United States who died in a foreign country. The regulations further provide (article 414, Customs Regulations, 1937) that the collector shall require an affidavit of a person having knowledge of the facts or otherwise satisfy himself as to the citizenship of the deceased owner of the effects at

the time of death. Therefore the collector is in duty bound to do two things: First to determine the ownership status of the merchandise at the time of importation, and second, if title is in the estate of the deceased, to ascertain the citizenship of the deceased owner at the time of death. The affidavit provided for was not filed with the papers. Consequently we have the right to infer that the collector found that the title to effects was not in the estate of the citizen who died in a foreign country or that such person was not a citizen.

In view of the fact that it may be presumed that the collector has acted in accordance with the law and the regulations, we are of the opinion that the plaintiffs have not overcome the presumption of correctness of the collector's classification inasmuch as it is not established in the record in whom title rested at the time of importation. The ownership of the articles at the time of importation seems to have been entirely overlooked in the stipulation. Indeed, counsel for the Government as well as for the importer, in briefs before us, have devoted their entire effort to the question of the citizenship of Lily Bredon, deceased.

Upon that question, to wit, the loss of citizenship of an American-born woman because of marriage to an alien, counsel for the importer, after an extensive citation and review of the many decisions of Federal and State tribunals, contend that Mrs. Bredon, at the time of her death in 1937, was a citizen of the United States for the following reasons:

First, she was born in the United States and did not lose her citizenship upon her marriage to a British subject in 1875, under the Federal statutes then in force;

Second, that even though her domicile was changed as a consequence of her marriage, and followed that of her husband, her status as an American citizen was not affected because she became a resident of a country to which her husband owed no allegiance; and

Third, assuming that her citizenship was lost solely by reason of her marriage, she regained the same before her death by reason of the act of June 25, 1936, 8 U. S. C. 9a, inasmuch as the provisos to such act are not applicable to Mrs. Bredon as she claimed no rights of citizenship under the statute.

The Government citing and discussing many of the same decisions contends that—

1. Mrs. Bredon lost her citizenship by reason of her marriage to an alien and subsequent emigration from this country.

2. Mrs. Bredon did not regain her citizenship by virtue of the act of 1907 and subsequent acts including the act of 1936 because (a) she did not lose her citizenship solely by reason of her marriage to an

alien, and (b) having lost her citizenship she failed to comply with any Act reinstating her to citizenship status in the United States.

Until the year 1907 there was no Federal statute governing the citizenship status of an American-born woman who married an alien. On March 2 of that year Congress enacted chapter 2534, section 3, vol. 34 U. S. Stat. at Large, page 1228, and therein provided that any American woman who married a foreigner shall take the nationality of her husband. The foregoing statute also provided that at the termination of the marital relationship she might resume her American citizenship as therein provided.

Later Congress further enacted, to wit, on September 22, 1922, an act relative to the naturalization and citizenship of married women, chapter 411, section 3, vol. 42, U. S. Stat. at Large, part 1, page 1022, and therein provided that after the passage of said act an American woman shall not cease to be a citizen by reason of marriage unless she makes a formal renunciation of her citizenship. The statute, however, made no change of the citizenship status of a person married prior to the passage of said act.

Again legislating upon this subject on June 25, 1936, Congress enacted a statute, chapter 801, section 3, vol. 49, U. S. Stat. at Large, part 1, page 1917, to repatriate native-born women who have heretofore lost their citizenship solely by reason of marriage to an alien prior to September 22, 1922 and whose marital status had terminated. It was therein provided that such person shall be deemed to be a citizen of the United States to the same extent as though her marriage to said alien had taken place on or after September 22, 1922. By this act, the act of 1922 was made retroactive insofar as it related to women who had lost their citizenship by reason of marriage to an alien under the act of 1907 and whose marital relationship had terminated. However, it was also provided in said act that:

no such woman shall have or claim any rights as a citizen of the United States until she shall have duly taken the oath of allegiance as prescribed in section 4 of the Act approved June 29, 1906 (34 Stat. 596; U. S. C., title 8, sec. 381), at any place within or under the jurisdiction of the United States before a court exercising naturalization jurisdiction thereunder or, outside of the jurisdiction of the United States, before a secretary of embassy or legation or a consular officer as prescribed in section 1750 of the Revised Statutes of the United States (U. S. C., Title 22, sec. 131); and such officer before whom such oath of allegiance shall be taken shall make entry thereof in the records of his office or in the naturalization records of the court, as the case may be, and shall deliver to such person taking such oath, upon demand, a certified copy of the proceedings had, including a copy of the oath administered, under the seal of his office or of such court, at a cost not exceeding $1, which shall be evidence of the facts stated therein before any court of record or judicial tribunal and in any department of the United States.

Prior to the adoption of the Federal Statute of 1907, our courts were not in agreement as to whether or not an American-born woman

lost her citizenship by reason of her marriage to an alien. There was, however, not any great conflict where the marriage was coupled with the removal to a foreign country. In view of our position that later judicial decisions govern our decision in this case, we think it would make this opinion unduly voluminous for us to discuss in detail the arguments and cases rendered prior to that time. However, we believe that the decisions on the subject prior to the adoption of the act of 1907, *supra*, generally hold that the marriage of a native-born American woman to an alien, where removal from the United States was not involved, did not divest her of American citizenship. See *Comitis* v. *Parkerson*, 56 Fed. 556; *Wallenburg* v. *Missouri. Pacific Railway Co.*, 159 Fed. 217, and the case of *In re Fitzroy*, 4 Fed. (2) 541. The contrary view was held in the cases of *In re Page*, 12 Fed. (2) 135; and *Pequignot* v. *City of Detroit*, 16 Fed. 211.

However, when the marriage between a native-born American woman and a foreigner was coupled with her removal with her husband from the United States, she was held to have lost her citizenship in the United States. See *Shanks* v. *Dupont*, 28 U. S. 242; *Jennes* v. *Landes*, 84 Fed. 73; *Ruckgaber* v. *Moore*, 104 Fed. 947; *In re Wright*, 19 Fed. Supp. 224. The contrary view was taken by the courts in the cases of *Beck* v. *McGillis*, 9 Barb. 46; *Doyle* v. *Town of Diana*, 196 N. Y. Supp. 864; and in *Petition of Zogbaum*, 32 Fed. (2) 911.

After the passage of the act of 1907 it was held in the following cases that the marriage of an American-born woman with an alien acted to divest her of citizenship, even though she remained with her husband in the United States. See *MacKenzie* v. *Hare*, 239 U. S. 299; *Petition of Drysdale*, 20 Fed. (2) 957; *In re Krausmann*, 28 Fed. (2) 1004; and *In re Wohlgemuth*, 35 Fed. (2) 1007. No conflict in the above holdings has been drawn to our attention.

While the only question in the case of *In re Wright*, 19 Fed. Supp. 224, was the construction of the act of 1936, 8 U. S. C. A. sec. 9a, as to whether Mrs. Wright could avail herself of the benefits of that act, the facts involved there and those involved here are almost identical. Both women married English citizens prior to the adoption of the act of 1907. The facts differ only in that Mrs. Wright returned to this country and was residing here at the time she made the application while in the instant case Mrs. Bredon never returned to this country to reside. That Mrs. Wright resided for a time in Italy and afterwards lived in England, which was the country of her husband, while in the instant case Mrs. Bredon married an Englishman and, so far as the record discloses, at all times resided with her husband in China. In our opinion, the fact that the husband of Mrs. Bredon had a domicile in China rather than in Great Britain is immaterial. Mrs. Bredon lived in China from 1879 until the day she died and never returned to America except for two visits.

We are quoting liberally from the court's opinion in the *Wright* case not only because the facts in that case are almost identical with those involved here, but because the statement of the court there as to the conflict in the decisions prior to the act of 1907 express fully the conclusion we have reached after an examination and study of those cases. The court stated:

It will be seen that Mrs. Wright was a native-born citizen. The question for our determination is whether she lost her United States citizenship solely by reason of her marriage prior to September 22, 1922, to an alien. If she did she must now be deemed to be a citizen and is entitled to take the oath of allegiance under the act of 1936 since her status as the wife of an alien has terminated.

If her marriage had taken place after the passage of the act of March 2, 1907 (34 Stat. 1228), the answer would necessarily have been that she did lose her citizenship by reason of her marriage, since that act provided that "any American woman who marries a foreigner shall take the nationality of her husband." Section 3. Her marriage took place before the passage of that act, however, and it, therefore, becomes necessary for us to determine whether prior to March 2, 1907, the marriage of an American woman to an alien terminated her citizenship.

On this question the cases appear to be in hopeless conflict. A number of them hold that the act of 1907 was but declaratory of the prior law. * * * On the other hand, it has been held that prior to March 2, 1907, the marriage of an American woman to an alien and residence with him abroad in the country of his citizenship until his death did not deprive her of her American citizenship. * * * (1) After full consideration, we find ourselves unable to accept either of these views, but have reached the conclusion which we think is supported by a great majority of the cases decided prior to March 2, 1907, that the marriage of an American woman to an alien prior to that date did not of itself deprive her of her American citizenship, even though such a marriage if followed by withdrawal from the United States would have that result. * * *

It seems to us that these cases from *Shanks* v. *Dupont* to *Wallenburg* v. *Missouri Pac. Ry. Co.* represent the state of the law as declared by the federal courts during the period in question. Furthermore, they include the only ruling of the Supreme Court upon the subject. Nothing could be clearer than the following statement of Mr. Justice Story in *Shanks* v. *Dupont, supra,* 3 Pet. 242, at page 246, 7 L. Ed. 666: "Neither did the marriage with Shanks produce that effect; because marriage with an alien, whether a friend or an enemy, produces no dissolution of the native allegiance of the wife. It may change her civil rights, but it does not affect her political rights or privileges. The general doctrine is, that no persons can, by any act of their own, without the consent of the government put off their allegiance, and become aliens."

The most that can be said is that the marriage of an American woman to an alien gave her an election to renounce her citizenship. To effect this renunciation and to complete expatriation, however, it was necessary for her to withdraw from the country or take some other equally patent step to show her election.

* * * * * * *

In the light of these contemporary cases laying down the prior law, we cannot follow the retrospective statements of that law set forth *In re Page* and other similar cases cited above which hold that the act of 1907 was merely declaratory of the previous law.

* * * We accordingly conclude that if Mrs. Wright lost her United States citizenship, it was not lost solely by reason of her marriage prior to September 22, 1922, to an alien, but resulted from her marriage plus her withdrawal from the

United States. It follows that she is not entitled to take the oath of allegiance under the act of June 25, 1936, and her application to do so must accordingly be refused.

It is clear that the court did not regard Mrs. Wright as a former citizen who had lost her United States citizenship solely by reason of her marriage to an alien prior to September 22, 1922, but because of her marriage to an alien and her subsequent removal to a foreign country. It was therefore held that she was excluded from the provisions of the act of 1936 and had become an alien who was unable to regain her citizenship without taking out her citizenship papers in accordance with the laws governing the application of any other alien desiring to assume citizenship in this country.

We are also impressed by the decision upon this subject rendered by the Supreme Court in May 1939 in the case of *Perkins* v. *Elg*, 307 U. S. 325. There the court held that a citizen by birth retains his United States citizenship until deprived of it through the operation of a treaty or congressional enactment or by his voluntary action in conformity with applicable legal principles. The court observed that when a citizen of the United States voluntarily becomes naturalized or renaturalized in a foreign country he is to be regarded as having lost his rights as an American citizen. The court also refers to naturalization treaties entered into between the United States and foreign countries between the years 1868 and 1872 which should be taken into consideration in the determination of the citizenship of persons born in the United States who have thereafter left this country.

The effect of treaties upon the question of citizenship was also thoroughly discussed in the case of *United States* v. *Perkins*, 17 Fed. Supp. 177. That court referred particularly to a treaty entered into in 1870 between the United States and Great Britain, 16 Stat. 775, and stated that the words "naturalized according to law" in said treaty included naturalization by marriage and therefore held that under said treaty an American-born woman who married a British subject in 1906 in England thereby lost her citizenship in the United States.

From a careful study of all of the various decisions and Federal statutes, it seems clear to us that Mrs. Bredon became a naturalized British subject by reason of her marriage and subsequent removal from the United States under the terms of the Convention with Great Britain in 1870. There is nothing in the record before us to establish that she made any attempt to regain her American citizenship by registering as an American within one year under the act of 1907 granting such privilege; nor is there any evidence that she made any effort to take advantage of the act of 1936; nor that she proceeded to become naturalized under the naturalization laws of this country. As we view the situation before us, the articles in

question are not entitled to free entry under the provisions of paragraph 1739, even though such articles were actually proven to be a part of the estate of the deceased at the time of importation.

For the reasons stated, judgment will be entered in favor of the Government.