## PEREZ *v.* BROWNELL, ATTORNEY GENERAL.

No. 44.   Argued May 1, 1957.—Restored to the calendar for reargument June 24, 1957.—Reargued October 28, 1957.—Decided March 31, 1958.*

---

*[On the same day, an order was entered substituting Attorney General Rogers for former Attorney General Brownell as the party respondent.   See *post,* p. 915.]

Charles A. Horsky argued the cause for petitioner. With him on the briefs were *Fred Okrand, A. L. Wirin, Jack Wasserman* and *Salvatore C. J. Fusco.*

*Oscar H. Davis* argued the cause for respondent on the original argument, and *Solicitor General Rankin* on the reargument. With them on the briefs were *Warren Olney, III,* then Assistant Attorney General, and *J. F. Bishop. Beatrice Rosenberg* was also with them on the brief on the reargument.

*John W. Willis* filed a brief for Mendoza-Martinez, as *amicus curiae.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

Petitioner, a national of the United States by birth, has been declared to have lost his American citizenship by operation of the Nationality Act of 1940, 54 Stat. 1137, as amended by the Act of September 27, 1944, 58 Stat. 746. Section 401 of that Act [1] provided that

> "A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

> .    .    .    .    .

> "(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory; or

> .    .    .    .    .

---

[1] Incorporated into § 349 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 267–268, 8 U. S. C. § 1481.

"(j) Departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the land or naval forces of the United States."

He seeks a reversal of the judgment against him on the ground that these provisions were beyond the power of Congress to enact.

Petitioner was born in Texas in 1909. He resided in the United States until 1919 or 1920, when he moved with his parents to Mexico, where he lived, apparently without interruption, until 1943. In 1928 he was informed that he had been born in Texas. At the outbreak of World War II, petitioner knew of the duty of male United States citizens to register for the draft, but he failed to do so. In 1943 he applied for admission to the United States as an alien railroad laborer, stating that he was a native-born citizen of Mexico, and was granted permission to enter on a temporary basis. He returned to Mexico in 1944 and shortly thereafter applied for and was granted permission, again as a native-born Mexican citizen, to enter the United States temporarily to continue his employment as a railroad laborer. Later in 1944 he returned to Mexico once more. In 1947 petitioner applied for admission to the United States at El Paso, Texas, as a citizen of the United States. At a Board of Special Inquiry hearing (and in his subsequent appeals to the Assistant Commissioner and the Board of Immigration Appeals), he admitted having remained outside of the United States to avoid military service and having voted in political elections in Mexico. He was ordered excluded on the ground that he had expatriated himself; this order was affirmed on appeal. In 1952 petitioner, claiming to be a native-born citizen of Mexico,

was permitted to enter the United States as an alien agricultural laborer. He surrendered in 1953 to immigration authorities in San Francisco as an alien unlawfully in the United States but claimed the right to remain by virtue of his American citizenship. After a hearing before a Special Inquiry Officer, he was ordered deported as an alien not in possession of a valid immigration visa; this order was affirmed on appeal to the Board of Immigration Appeals.

Petitioner brought suit in 1954 in a United States District Court for a judgment declaring him to be a national of the United States.[2] The court, sitting without a jury, found (in addition to the undisputed facts set forth above) that petitioner had remained outside of the United States from November 1944 to July 1947 for the purpose of avoiding service in the armed forces of the United States and that he had voted in a "political election" in Mexico in 1946. The court, concluding that he had thereby expatriated himself, denied the relief sought by the petitioner. The United States Court of Appeals for the Ninth Circuit affirmed. 235 F. 2d 364. We granted certiorari because of the constitutional questions raised by the petitioner. 352 U. S. 908.

---

[2] Petitioner proceeded under § 503 of the Nationality Act of 1940, 54 Stat. 1137, 1171, which authorizes an individual to bring suit for a declaration of nationality in a United States District Court against the head of any government agency that denies him a right or privilege of United States nationality on the ground that he is not a United States national. The judicial hearing in such an action is a trial *de novo* in which the individual need make only a *prima facie* case establishing his citizenship by birth or naturalization. See *Pandolfo* v. *Acheson,* 202 F. 2d 38, 40–41. The Government must prove the act of expatriation on which the denial was based by " 'clear, unequivocal, and convincing' evidence which does not leave 'the issue in doubt'." *Gonzales* v. *Landon,* 350 U. S. 920; see *Schneiderman* v. *United States,* 320 U. S. 118, 158.

Statutory expatriation, as a response to problems of international relations, was first introduced just a half century ago. Long before that, however, serious friction between the United States and other nations had stirred consideration of modes of dealing with the difficulties that arose out of the conflicting claims to the allegiance of foreign-born persons naturalized in the United States, particularly when they returned to the country of their origin.

As a starting point for grappling with this tangle of problems, Congress in 1868 formally announced the traditional policy of this country that it is the "natural and inherent right of all people" to divest themselves of their allegiance to any state, 15 Stat. 223, R. S. § 1999. Although the impulse for this legislation had been the refusal by other nations, notably Great Britain, to recognize a right in naturalized Americans who had been their subjects to shed that former allegiance, the Act of 1868 was held by the Attorney General to apply to divestment by native-born and naturalized Americans of their United States citizenship. 14 Op. Atty. Gen. 295, 296. In addition, while the debate on the Act of 1868 was proceeding, negotiations were completed on the first of a series of treaties for the adjustment of some of the disagreements that were constantly arising between the United States and other nations concerning citizenship. These instruments typically provided that each of the signatory nations would regard as a citizen of the other such of its own citizens as became naturalized by the other. *E. g.,* Treaty with the North German Confederation, Feb. 22, 1868, 2 Treaties, Conventions, International Acts, etc. (comp. Malloy, 1910), 1298. This series of treaties initiated this country's policy of automatic divestment of citizenship for specified conduct affecting our foreign relations.

On the basis, presumably, of the Act of 1868 and such treaties as were in force, it was the practice of the Department of State during the last third of the nineteenth century to make rulings as to forfeiture of United States citizenship by individuals who performed various acts abroad. See Borchard, Diplomatic Protection of Citizens Abroad, §§ 319, 324. Naturalized citizens who returned to the country of their origin were held to have abandoned their citizenship by such actions as accepting public office there or assuming political duties. See Davis to Weile, Apr. 18, 1870, 3 Moore, Digest of International Law, 737; Davis to Taft, Jan. 18, 1883, 3 *id.*, at 739. Native-born citizens of the United States (as well as naturalized citizens outside of the country of their origin) were generally deemed to have lost their American citizenship only if they acquired foreign citizenship. See Bayard to Suzzara-Verdi, Jan. 27, 1887, 3 *id.*, at 714; see also *Comitis* v. *Parkerson,* 56 F. 556, 559.

No one seems to have questioned the necessity of having the State Department, in its conduct of the foreign relations of the Nation, pass on the validity of claims to American citizenship and to such of its incidents as the right to diplomatic protection. However, it was recognized in the Executive Branch that the Department had no specific legislative authority for nullifying citizenship, and several of the Presidents urged Congress to define the acts by which citizens should be held to have expatriated themselves. *E. g.,* Message of President Grant to Congress, Dec. 7, 1874, 7 Messages and Papers of the Presidents (Richardson ed. 1899) 284, 291–292. Finally in 1906, during the consideration of the bill that became the Naturalization Act of 1906, a Senate resolution and a recommendation of the House Committee on Foreign Affairs called for an examination of the problems relating to American citizenship, expatriation and protection

abroad. In response to these suggestions the Secretary of State appointed the Citizenship Board of 1906, composed of the Solicitor of the State Department, the Minister to the Netherlands and the Chief of the Passport Bureau. The board conducted a study and late in 1906 made an extensive report with recommendations for legislation.

Among the recommendations of the board were that expatriation of a citizen "be assumed" when, in time of peace, he became naturalized in a foreign state, engaged in the service of a foreign state where such service involved the taking of an oath of allegiance to that state, or domiciled in a foreign state for five years with no intention to return. Citizenship of the United States, Expatriation, and Protection Abroad, H. R. Doc. No. 326, 59th Cong., 2d Sess. 23. It also recommended that an American woman who married a foreigner be regarded as losing her American citizenship during coverture. *Id.*, at 29. As to the first two recommended acts of expatriation, the report stated that "no man should be permitted deliberately to place himself in a position where his services may be claimed by more than one government and his allegiance be due to more than one." *Id.*, at 23. As to the third, the board stated that more and more Americans were going abroad to live "and the question of their protection causes increasing embarrassment to this Government in its relations with foreign powers." *Id.*, at 25.

Within a month of the submission of this report a bill was introduced in the House by Representative Perkins of New York based on the board's recommendations. Perkins' bill provided that a citizen would be "deemed to have expatriated himself" when, in peacetime, he became naturalized in a foreign country or took an oath of allegiance to a foreign state; it was presumed that a naturalized citizen who resided for five years in a foreign state had

ceased to be an American citizen, and an American woman who married a foreigner would take the nationality of her husband. 41 Cong. Rec. 1463–1464. Perkins stated that the bill was designed to discourage people from evading responsibilities both to other countries and to the United States and "to save our Government [from] becoming involved in any trouble or question with foreign countries where there is no just reason." *Id.*, at 1464. What little debate there was on the bill centered around the foreign domicile provision; no constitutional issue was canvassed. The bill passed the House, and, after substantially no debate and the adoption of a committee amendment adding a presumption of termination of citizenship for a naturalized citizen who resided for two years in the country of his origin, 41 Cong. Rec. 4116, the Senate passed it and it became the Expatriation Act of 1907. 34 Stat. 1228.

The question of the power of Congress to enact legislation depriving individuals of their American citizenship was first raised in the courts by *Mackenzie* v. *Hare,* 239 U. S. 299. The plaintiff in that action, Mrs. Mackenzie, was a native-born citizen and resident of the United States. In 1909 she married a subject of Great Britain and continued to reside with him in the United States. When, in 1913, she applied to the defendants, members of a board of elections in California, to be registered as a voter, her application was refused on the ground that by reason of her marriage she had ceased to be a citizen of the United States. Her petition for a writ of mandamus was denied in the state courts of California, and she sued out a writ of error here, claiming that if the Act of 1907 was intended to apply to her it was beyond the power of Congress. The Court, through Mr. Justice McKenna, after finding that merging the identity of husband and wife, as Congress had done in this instance, had

a "purpose and, it may be, necessity, in international policy," continued:

"As a government, the United States is invested with all the attributes of sovereignty. As it has the character of nationality it has the powers of nationality, especially those which concern its relations and intercourse with other countries. We should hesitate long before limiting or embarrassing such powers. . . . We concur with counsel that citizenship is of tangible worth, and we sympathize with plaintiff in her desire to retain it and in her earnest assertion of it. But there is involved more than personal considerations. As we have seen, the legislation was urged by conditions of national moment. . . . It is the conception of the legislation under review that such an act may bring the Government into embarrassments and, it may be, into controversies. . . ." 239 U. S., at 311–312.

The Court observed that voluntary marriage of an American woman with a foreigner may have the same consequences, and "involve national complications of like kind," as voluntary expatriation in the traditional sense. It concluded: "This is no arbitrary exercise of government." 239 U. S., at 312. See also *Ex parte Griffin,* 237 F. 445; *Ex parte Ng Fung Sing,* 6 F. 2d 670.

By the early 1930's, the American law on nationality, including naturalization and denationalization, was expressed in a large number of provisions scattered throughout the statute books. Some of the specific laws enacted at different times seemed inconsistent with others, some problems of growing importance had emerged that Congress had left unheeded. At the request of the House Committee on Immigration and Naturalization, see 86 Cong. Rec. 11943, President Franklin D. Roosevelt established a Committee composed of the Secretary of State,

the Attorney General and the Secretary of Labor to review the nationality laws of the United States, to recommend revisions and to codify the nationality laws into one comprehensive statute for submission to Congress; he expressed particular concern about "existing discriminations" in the law. Exec. Order No. 6115, Apr. 25, 1933. The necessary research for such a study was entrusted to specialists representing the three departments. Five years were spent by these officials in the study and formulation of a draft code. In their letter submitting the draft code to the President after it had been reviewed within the Executive Branch, the Cabinet Committee noted the special importance of the provisions concerning loss of nationality and asserted that none of these provisions was "designed to be punitive or to interfere with freedom of action"; they were intended to deprive of citizenship those persons who had shown that "their real attachment is to the foreign country and not to the United States." Codification of the Nationality Laws of the United States, H. R. Comm. Print, Pt. 1, 76th Cong., 1st Sess. v–vii.

The draft code of the Executive Branch was an omnibus bill in five chapters. The chapter relating to "Loss of Nationality" provided that any citizen should "lose his nationality" by becoming naturalized in a foreign country; taking an oath of allegiance to a foreign state; entering or serving in the armed forces of a foreign state; being employed by a foreign government in a post for which only nationals of that country are eligible; voting in a foreign political election or plebiscite; using a passport of a foreign state as a national thereof; formally renouncing American citizenship before a consular officer abroad; deserting the armed forces of the United States in wartime (upon conviction by court martial); if a naturalized citizen, residing in the state of his former nationality or birth for two years if he thereby acquires the nationality of that state; or, if a naturalized citizen,

54

residing in the state of his former nationality or birth for three years.  *Id.*, at 66–76.

In support of the recommendation of voting in a foreign political election as an act of expatriation, the Committee reported:

> "Taking an active part in the political affairs of a foreign state by voting in a political election therein is believed to involve a political attachment and practical allegiance thereto which is inconsistent with continued allegiance to the United States, whether or not the person in question has or acquires the nationality of the foreign state.  In any event it is not believed that an American national should be permitted to participate in the political affairs of a foreign state and at the same time retain his American nationality.  The two facts would seem to be inconsistent with each other."  *Id.*, at 67.

As to the reference to plebiscites in the draft language, the report states: "If this provision had been in effect when the Saar Plebiscite was held, Americans voting in it would have been expatriated."  *Ibid.*  It seems clear that the most immediate impulse for the entire voting provision was the participation by many naturalized Americans in the plebiscite to determine sovereignty over the Saar in January 1935.  H. R. Rep. No. 216, 74th Cong., 1st Sess. 1.  Representative Dickstein of New York, Chairman of the House Committee on Immigration and Naturalization, who had called the plebiscite an "international dispute" in which naturalized American citizens could not properly participate, N. Y. Times, Jan. 4, 1935, p. 12, col. 3, had introduced a bill in the House in 1935 similar in language to the voting provisions in the draft code, 79 Cong. Rec. 2050, but, although it was favorably reported, the House did not pass it.

In June 1938 the President submitted the Cabinet Committee's draft code and the supporting report to Congress. In due course, Chairman Dickstein introduced the code as H. R. 6127, and it was referred to his committee. In early 1940 extensive hearings were held before both a subcommittee and the full committee at which the interested Executive Branch agencies and others testified. With respect to the voting provision, Chairman Dickstein spoke of the Americans who had voted in the Saar plebiscite and said, "If they are American citizens they had no right to vote, to interfere with foreign matters or political subdivision." Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, 76th Cong., 1st Sess. 287. Mr. Flournoy, Assistant Legal Adviser of the State Department, said that the provision would be "particularly applicable" to persons of dual nationality, *id.*, at 132; however, a suggestion that the provision be made applicable only to dual nationals, *id.*, at 398, was not adopted.

Upon the conclusion of the hearings in June 1940 a new bill was drawn up and introduced as H. R. 9980. The only changes from the Executive Branch draft with respect to the acts of expatriation were the deletion of using a foreign passport and the addition of residence by a naturalized citizen for five years in any foreign country as acts that would result in loss of nationality. 86 Cong. Rec. 11960–11961. The House debated the bill for a day in September 1940. In briefly summarizing the loss of nationality provisions of the bill, Chairman Dickstein said that "this bill would put an end to dual citizenship and relieve this country of the responsibility of those who reside in foreign lands and only claim citizenship when it serves their purpose." *Id.*, at 11944. Representative Rees of Kansas, who had served as chairman of the subcommittee that studied the draft code, said that clarifying

legislation was needed, among other reasons, "because of the duty of the Government to protect citizens abroad." *Id.*, at 11947. The bill passed the House that same day. *Id.*, at 11965.

In the Senate also, after a favorable report from the Committee on Immigration, the bill was debated very briefly. Committee amendments were adopted making the provision on foreign military service applicable only to dual nationals, making treason an act of expatriation and providing a procedure by which persons administratively declared to have expatriated themselves might obtain judicial determinations of citizenship. The bill as amended was passed. *Id.*, at 12817–12818. The House agreed to these and all other amendments on which the Senate insisted, *id.*, at 13250, and, on October 14, the Nationality Act of 1940 became law. 54 Stat. 1137.

The loss of nationality provisions of the Act constituted but a small portion of a long omnibus nationality statute. It is not surprising, then, that they received as little attention as they did in debate and hearings and that nothing specific was said about the constitutional basis for their enactment. The bill as a whole was regarded primarily as a codification—and only secondarily as a revision—of statutes that had been in force for many years, some of them, such as the naturalization provisions, having their beginnings in legislation 150 years old. It is clear that, as is so often the case in matters affecting the conduct of foreign relations, Congress was guided by and relied very heavily upon the advice of the Executive Branch, and particularly the State Department. See, *e. g.*, 86 Cong. Rec. 11943–11944. In effect, Congress treated the Cabinet Committee as it normally does its own committees charged with studying a problem and formulating legislation. These considerations emphasize the importance, in the inquiry into congressional power in this field, of keeping in mind the historical background

of the challenged legislation, for history will disclose the purpose fairly attributable to Congress in enacting the statute.

The first step in our inquiry must be to answer the question: what is the source of power on which Congress must be assumed to have drawn? Although there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation of foreign affairs, there can be no doubt of the existence of this power in the law-making organ of the Nation. See *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 318; *Mackenzie* v. *Hare,* 239 U. S. 299, 311–312. The States that joined together to form a single Nation and to create, through the Constitution, a Federal Government to conduct the affairs of that Nation must be held to have granted that Government the powers indispensable to its functioning effectively in the company of sovereign nations. The Government must be able not only to deal affirmatively with foreign nations, as it does through the maintenance of diplomatic relations with them and the protection of American citizens sojourning within their territories. It must also be able to reduce to a minimum the frictions that are unavoidable in a world of sovereigns sensitive in matters touching their dignity and interests.
The inference is fairly to be drawn from the congressional history of the Nationality Act of 1940, read in light of the historical background of expatriation in this country, that, in making voting in foreign elections (among other behavior) an act of expatriation, Congress was seeking to effectuate its power to regulate foreign affairs. The legislators, counseled by those on whom they rightly relied for advice, were concerned about actions by citizens in foreign countries that create problems of protection and are inconsistent with American allegiance. Moreover, we cannot ignore the fact that embarrassments

in the conduct of foreign relations were of primary concern in the consideration of the Act of 1907, of which the loss of nationality provisions of the 1940 Act are a codification and expansion.

Broad as the power in the National Government to regulate foreign affairs must necessarily be, it is not without limitation. The restrictions confining Congress in the exercise of any of the powers expressly delegated to it in the Constitution apply with equal vigor when that body seeks to regulate our relations with other nations. Since Congress may not act arbitrarily, a rational nexus must exist between the content of a specific power in Congress and the action of Congress in carrying that power into execution. More simply stated, the means—in this case, withdrawal of citizenship—must be reasonably related to the end—here, regulation of foreign affairs. The inquiry—and, in the case before us, the sole inquiry—into which this Court must enter is whether or not Congress may have concluded not unreasonably that there is a relevant connection between this fundamental source of power and the ultimate legislative action.[3]

---

[3] The provision of the Fourteenth Amendment that "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States . . ." sets forth the two principal modes (but by no means the only ones) for acquiring citizenship. Thus, in *United States* v. *Wong Kim Ark,* 169 U. S. 649 (Chief Justice Fuller and Mr. Justice Harlan dissenting), it was held that a person of Chinese parentage born in this country was among "all persons born . . . in the United States" and therefore a citizen to whom the Chinese Exclusion Acts did not apply. But there is nothing in the terms, the context, the history or the manifest purpose of the Fourteenth Amendment to warrant drawing from it a restriction upon the power otherwise possessed by Congress to withdraw citizenship. The limit of the operation of that provision was clearly enunciated in *Perkins* v. *Elg,* 307 U. S. 325, 329: "As at birth she became a citizen of the United States, that citizenship must

Our starting point is to ascertain whether the power of Congress to deal with foreign relations may reasonably be deemed to include a power to deal generally with the active participation, by way of voting, of American citizens in foreign political elections. Experience amply attests that, in this day of extensive international travel, rapid communication and widespread use of propaganda, the activities of the citizens of one nation when in another country can easily cause serious embarrassments to the government of their own country as well as to their fellow citizens. We cannot deny to Congress the reasonable belief that these difficulties might well become acute, to the point of jeopardizing the successful conduct of international relations, when a citizen of one country chooses to participate in the political or governmental affairs of another country. The citizen may by his action unwittingly promote or encourage a course of conduct contrary to the interests of his own government; moreover, the people or government of the foreign country may regard his action to be the action of his government, or at least as a reflection if not an expression of its policy. Cf. Preuss, International Responsibility for Hostile Propaganda Against Foreign States, 28 Am. J. Int'l L. 649, 650.

It follows that such activity is regulable by Congress under its power to deal with foreign affairs. And it must be regulable on more than an *ad hoc* basis. The subtle influences and repercussions with which the Government must deal make it reasonable for the generalized, although clearly limited, category of "political election" to be used in defining the area of regulation. That description carries with it the scope and meaning of its context and purpose; classes of elections—nonpolitical in the col-

---

be deemed to continue unless she has been deprived of it through the operation of a treaty or congressional enactment or by her voluntary action in conformity with applicable legal principles."

loquial sense—as to which participation by Americans could not possibly have any effect on the relations of the United States with another country are excluded by any rational construction of the phrase. The classification that Congress has adopted cannot be said to be inappropriate to the difficulties to be dealt with. Specific applications are of course open to judicial challenge, as are other general categories in the law, by a "gradual process of judicial inclusion and exclusion." *Davidson* v. *New Orleans,* 96 U. S. 97, 104.[4]

The question must finally be faced whether, given the power to attach some sort of consequence to voting in a foreign political election, Congress, acting under the Necessary and Proper Clause, Art. I, § 8, cl. 18, could attach loss of nationality to it. Is the means, withdrawal of citizenship, reasonably calculated to effect the end that is within the power of Congress to achieve, the avoidance of embarrassment in the conduct of our foreign relations attributable to voting by American citizens in foreign political elections? The importance and extreme delicacy of the matters here sought to be regulated demand that Congress be permitted ample scope in selecting appropriate modes for accomplishing its purpose. The critical connection between this conduct and loss of citizenship is the fact that it is the possession of American citizenship by a person committing the act that makes the act potentially embarrassing to the American Government and pregnant with the possibility of embroiling this country in disputes with other nations. The termination of citizenship terminates the problem. Moreover, the fact is not without significance that Congress has interpreted

---

[4] Petitioner in the case before us did not object to the characterization of the election in which he voted as a "political election." It may be noted that, in oral argument, counsel for the petitioner expressed his understanding that the election involved was the election for Mexico's president.

this conduct, not irrationally, as importing not only something less than complete and unswerving allegiance to the United States but also elements of an allegiance to another country in some measure, at least, inconsistent with American citizenship.

Of course, Congress can attach loss of citizenship only as a consequence of conduct engaged in voluntarily. See *Mackenzie* v. *Hare,* 239 U. S. 299, 311–312. But it would be a mockery of this Court's decisions to suggest that a person, in order to lose his citizenship, must intend or desire to do so. The Court only a few years ago said of the person held to have lost her citizenship in *Mackenzie* v. *Hare, supra:* "The woman had not intended to give up her American citizenship." *Savorgnan* v. *United States,* 338 U. S. 491, 501. And the latter case sustained the denationalization of Mrs. Savorgnan although it was not disputed that she "had no intention of endangering her American citizenship or of renouncing her allegiance to the United States." 338 U. S., at 495.[5] What both women did do voluntarily was to engage in conduct to which Acts of Congress attached the consequence of denationalization irrespective of—and, in those cases, absolutely contrary to—the intentions and desires of the individuals. Those two cases mean nothing—indeed, they are deceptive—if their essential significance is not rejection of the notion that the power of Congress to terminate citizenship depends upon the citizen's assent. It is a distortion of those cases to explain them away on a theory that a citizen's assent to denationalization may be inferred from his having engaged in conduct that amounts to an "abandonment of citizenship" or a "trans-

---

[5] The District Court in *Savorgnan* stated: "I am satisfied from the proofs submitted that at the time plaintiff signed Exhibits 1 and 2 [application for Italian citizenship and oath of allegiance to Italian 'Government] she had no present or fixed intention in her mind to expatriate herself." 73 F. Supp. 109, 111.

fer of allegiance." Certainly an Act of Congress cannot be invalidated by resting decisive precedents on a gross fiction—a fiction baseless in law and contradicted by the facts of the cases.

It cannot be said, then, that Congress acted without warrant when, pursuant to its power to regulate the relations of the United States with foreign countries, it provided that anyone who votes in a foreign election of significance politically in the life of another country shall lose his American citizenship. To deny the power of Congress to enact the legislation challenged here would be to disregard the constitutional allocation of governmental functions that it is this Court's solemn duty to guard.

Because of our view concerning the power of Congress with respect to § 401 (e) of the Nationality Act of 1940, we find it unnecessary to consider—indeed, it would be improper for us to adjudicate—the constitutionality of § 401 (j), and we expressly decline to rule on that important question at this time.

*Judgment affirmed.*

MR. CHIEF JUSTICE WARREN, with whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

The Congress of the United States has decreed that a citizen of the United States shall lose his citizenship by performing certain designated acts.[1] The petitioner in

---

[1] Section 401 of the Nationality Act of 1940, 54 Stat. 1137, 1168–1169, as amended, 8 U. S. C. § 1481.

The fact that the statute speaks in terms of loss of nationality does not mean that it is not petitioner's citizenship that is being forfeited. He is a national by reason of his being a citizen, § 101 (b), Nationality Act of 1940, 54 Stat. 1137, 8 U. S. C. § 1101 (a) (22). Hence he loses his citizenship when he loses his status as a national of the United States. In the context of this opinion, the terms nationality and citizenship can be used interchangeably. Cf. *Rabang* v. *Boyd,* 353 U. S. 427.

this case, a native-born American,[2] is declared to have lost his citizenship by voting in a foreign election.[3]  Whether this forfeiture of citizenship exceeds the bounds of the Constitution is the issue before us.  The problem is fundamental and must be resolved upon fundamental considerations.

Generally, when congressional action is challenged, constitutional authority is found in the express and implied powers with which the National Government has been invested or in those inherent powers that are necessary attributes of a sovereign state.  The sweep of those powers is surely broad.  In appropriate circumstances, they are adequate to take away life itself.  The initial

---

[2] Petitioner was born in El Paso, Texas, in 1909, a fact of which he was apprised in 1928.  His Mexican-born parents took him to Mexico when he was 10 or 11 years old.  In 1932 petitioner married a Mexican national; they have seven children.  In 1943 and 1944 petitioner sought and received permission to enter this country for brief periods as a wartime railroad laborer.  In 1952 petitioner again entered this country as a temporary farm laborer.  After he had been ordered deported as an alien illegally in the United States, he brought this action for a declaratory judgment of citizenship, relying upon his birth in this country.

[3] Section 401 (e) of the Nationality Act of 1940, 54 Stat. 1169, 8 U. S. C. § 1481 (5).

The courts below concluded that petitioner had lost his citizenship for the additional reason specified in § 401 (j) of the Nationality Act, which was added in 1944, 58 Stat. 746, 8 U. S. C. § 1481 (10):

"Departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the land or naval forces of the United States."

The majority expressly declines to rule on the constitutional questions raised by § 401 (j).  My views on a statute of this sort are set forth in my opinion in *Trop* v. *Dulles, post,* p. 86, decided this day, involving similar problems raised by § 401 (g) of the Nationality Act, 54 Stat. 1169, as amended, 8 U. S. C. § 1481 (8).

question here is whether citizenship is subject to the exercise of these general powers of government.

What is this Government, whose power is here being asserted? And what is the source of that power? The answers are the foundation of our Republic. To secure the inalienable rights of the individual, "Governments are instituted among Men, deriving their just powers from the consent of the governed." I do not believe the passage of time has lessened the truth of this proposition. It is basic to our form of government. This Government was born of its citizens, it maintains itself in a continuing relationship with them, and, in my judgment, it is without power to sever the relationship that gives rise to its existence. I cannot believe that a government conceived in the spirit of ours was established with power to take from the people their most basic right.

Citizenship *is* man's basic right for it is nothing less than the right to have rights. Remove this priceless possession and there remains a stateless person, disgraced and degraded in the eyes of his countrymen. He has no lawful claim to protection from any nation, and no nation may assert rights on his behalf.[4] His very existence is at the sufferance of the state within whose borders he happens to be. In this country the expatriate would presumably enjoy, at most, only the limited rights and privileges of aliens,[5] and like the alien he might even

---

[4] See Borchard, Diplomatic Protection of Citizens Abroad (1916), § 8; 1 Oppenheim, International Law (7th ed., Lauterpacht, 1948), §§ 291–294; Holborn, The Legal Status of Political Refugees, 1920–1938, 32 Am. J. Int'l L. 680 (1938); Preuss, International Law and Deprivation of Nationality, 23 Geo. L. J. 250 (1934); Study on Statelessness, U. N. Doc. No. E/1112 (1949); 64 Yale L. J. 1164 (1955).

[5] See Konvitz, The Alien and the Asiatic in American Law (1946); Comment, 20 U. of Chi. L. Rev. 547 (1953). Cf. *Takahashi* v. *Fish & Game Commission*, 334 U. S. 410; *Oyama* v. *California*, 332 U. S. 633.

be subject to deportation and thereby deprived of the right to assert any rights.[6] This government was not established with power to decree this fate.

The people who created this government endowed it with broad powers. They created a sovereign state with power to function as a sovereignty. But the citizens themselves are sovereign, and their citizenship is not subject to the general powers of their government. Whatever may be the scope of its powers to regulate the conduct and affairs of all persons within its jurisdiction, a government *of* the people cannot take away their citizenship simply because one branch of that government can be said to have a conceivably rational basis for wanting to do so.

The basic constitutional provision crystallizing the right of citizenship is the first sentence of section one of the Fourteenth Amendment. It is there provided that "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the

---

[6] *Harisiades* v. *Shaughnessy,* 342 U. S. 580; *Fong Yue Ting* v. *United States,* 149 U. S. 698.

Even if Congress can divest United States citizenship, it does not necessarily follow that an American-born expatriate can be deported. He would be covered by the statutory definition of "alien," 8 U. S. C. § 1101 (a) (3), but he would not necessarily have come "from a foreign port or place" and hence may not have effected the "entry," 8 U. S. C. § 1101 (a) (13), specified in the deportation provisions, 8 U. S. C. § 1251. More fundamentally, since the deporting power has been held to be derived from the power to exclude, *Fong Yue Ting* v. *United States, supra,* it may well be that this power does not extend to persons born in this country. As to them, deportation would perhaps find its justification only as a punishment, indistinguishable from banishment. See dissenting opinions in *United States* v. *Ju Toy,* 198 U. S. 253, 264; *Fong Yue Ting* v. *United States, supra,* at 744.

Since this action for a declaratory judgment does not involve the validity of the deportation order against petitioner, it is unnecessary, as the Government points out, to resolve the question of whether this petitioner may be deported.

United States and of the State wherein they reside."
United States citizenship is thus the constitutional birth-
right of every person born in this country.   This Court
has declared that Congress is without power to alter this
effect of birth in the United States, *United States* v. *Wong
Kim Ark,* 169 U. S. 649, 703.   The Constitution also pro-
vides that citizenship can be bestowed under a "uniform
Rule of Naturalization," [7] but there is no corresponding
provision authorizing divestment.   Of course, naturaliza-
tion unlawfully procured can be set aside.[8]   But apart
from this circumstance, the status of the naturalized citi-
zen is secure.   As this Court stated in *Osborn* v. *Bank of
the United States,* 9 Wheat. 738, 827:

> "[The naturalized citizen] becomes a member of the
> society, possessing all the rights of a native citizen,
> and standing, in the view of the constitution, on the
> footing of a native.   *The constitution does not
> authorize Congress to enlarge or abridge those rights.*
> The simple power of the national Legislature, is to
> prescribe a uniform rule of naturalization, and the
> exercise of this power exhausts it, so far as respects
> the individual."   (Emphasis added.)

Under our form of government, as established by the
Constitution, the citizenship of the lawfully naturalized
and the native-born cannot be taken from them.

There is no question that citizenship may be volun-
tarily relinquished.   The right of voluntary expatriation
was recognized by Congress in 1868.[9]   Congress declared
that "the right of expatriation is a natural and inherent

---

[7] U. S. Const., Art. I, § 8, cl. 4.

[8] See, *e. g., Knauer* v. *United States,* 328 U. S. 654; *Baumgartner* v.
*United States,* 322 U. S. 665; *Schneiderman* v. *United States,* 320
U. S. 118.

[9] Act of July 27, 1868, 15 Stat. 223.

right of all people . . . ." [10]   Although the primary purpose of this declaration was the protection of our naturalized citizens from the claims of their countries of origin, the language was properly regarded as establishing the reciprocal right of American citizens to abjure their allegiance.[11]   In the early days of this Nation the right of expatriation had been a matter of controversy.   The common-law doctrine of perpetual allegiance was evident in the opinions of this Court.[12]   And, although impressment of naturalized American seamen of British birth was a cause of the War of 1812, the executive officials of this Government were not unwavering in their support of the right of expatriation.[13]   Prior to 1868 all efforts to obtain congressional enactments concerning expatriation failed.[14]   The doctrine of perpetual allegiance, however, was so ill-suited to the growing nation whose doors were open to immigrants from abroad that it could not last. Nine years before Congress acted Attorney General Black stated the American position in a notable opinion: [15]

> "Here, in the United States, the thought of giving it [the right of expatriation] up cannot be entertained for a moment.   Upon that principle this country was populated.   We owe to it our existence as a nation.

---

[10] *Ibid.*

[11] See *Savorgnan* v. *United States,* 338 U. S. 491, 498 and n. 11; Foreign Relations, 1873, H. R. Exec. Doc. No. 1, 43d Cong., 1st Sess., Pt. 1, Vol. II, 1186–1187, 1204, 1210, 1213, 1216, 1222 (views of President Grant's Cabinet members) ; 14 Op. Atty. Gen. 295; Tsiang, The Question of Expatriation in America Prior to 1907, 97–98, 108–109.

[12] See *Shanks* v. *Dupont,* 3 Pet. 242; *Inglis* v. *Trustees of Sailor's Snug Harbour,* 3 Pet. 99.

[13] 3 Moore, Digest of International Law, §§ 434–437 ; Tsiang, 45–55, 71–86, 110–112.

[14] Tsiang, 55–61.

[15] 9 Op. Atty. Gen. 356, 359.

"Ever since our independence we have upheld and maintained it by every form of words and acts. We have constantly promised full and complete protection to all persons who should come here and seek it by renouncing their natural allegiance and transferring their fealty to us. We stand pledged to it in the face of the whole world."

It has long been recognized that citizenship may not only be voluntarily renounced through exercise of the right of expatriation but also by other actions in derogation of undivided allegiance to this country.[16] While the essential qualities of the citizen-state relationship under our Constitution preclude the exercise of governmental power to divest United States citizenship, the establishment of that relationship did not impair the principle that conduct of a citizen showing a voluntary transfer of allegiance is an abandonment of citizenship. Nearly all sovereignties recognize that acquisition of foreign nationality ordinarily shows a renunciation of citizenship.[17] Nor is this the only act by which the citizen may show a voluntary abandonment of his citizenship. Any action by which he manifests allegiance to a foreign state may be so inconsistent with the retention of citizenship as to result in loss of that status.[18] In recognizing the consequence of such action, the Government is not taking away United States citizenship to implement its general regulatory powers, for, as previously indicated, in my judgment citizenship is immune from divestment under these

---

[16] See, e. g., Savorgnan v. United States, 338 U. S. 491; Mackenzie v. Hare, 239 U. S. 299; Bauer v. Clark, 161 F. 2d 397, cert. denied, 332 U. S. 839. Cf. Acheson v. Maenza, 92 U. S. App. D. C. 85, 202 F. 2d 453.

[17] See Laws Concerning Nationality, U. N. Doc. No. ST/LEG/SER.B/4 (1954).

[18] See, generally, Laws Concerning Nationality, op. cit. supra, note 17.

powers.   Rather, the Government is simply giving formal recognition to the inevitable consequence of the citizen's own voluntary surrender of his citizenship.

Twice before, this Court has recognized that certain voluntary conduct results in an impairment of the status of citizenship.   In *Savorgnan* v. *United States,* 338 U. S. 491, an American citizen had renounced her citizenship and acquired that of a foreign state.   This Court affirmed her loss of citizenship, recognizing that "From the beginning, one of the most obvious and effective forms of expatriation has been that of naturalization under the laws of another nation."   338 U. S., at 498.   *Mackenzie* v. *Hare,* 239 U. S. 299, involved an American woman who had married a British national.   That decision sustained an Act of Congress which provided that her citizenship was suspended for the duration of her marriage.   Since it is sometimes asserted that this case is authority for the broad proposition that Congress can take away United States citizenship, it is necessary to examine precisely what the case involved.

The statute which the Court there sustained did not divest Mrs. Mackenzie of her citizenship.[19]   It provided that "any American woman who marries a foreigner shall take the nationality of her husband."[20]   "At the termina-

---

[19] Act of March 2, 1907, 34 Stat. 1228–1229.   The full text is as follows:

"Sec. 3. That any American woman who marries a foreigner shall take the nationality of her husband.   At the termination of the marital relation she may resume her American citizenship, if abroad, by registering as an American citizen within one year with a consul of the United States, or by returning to reside in the United States, or, if residing in the United States at the termination of the marital relation, by continuing to reside therein."

[20] This clause merely expressed the well-understood principle that a wife's nationality "merged" with that of her husband's.   Cockburn, Nationality, 24; 3 Moore, Digest of International Law, 450–451, 453; 3 Hackworth, Digest of International Law, 246–247.   This was a

tion of the marital relation," the statute continues, "she may *resume* her American citizenship . . . ." (Emphasis added.) Her citizenship was not taken away; it was held in abeyance.

This view of the statute is borne out by its history. The 1907 Act was passed after the Department of State had responded to requests from both houses of Congress for a comprehensive study of our own and foreign nationality laws, together with recommendations for new legislation.[21] One of those recommendations, substantially incorporated in the 1907 Act, was as follows: [22]

> "That an American woman who marries a foreigner shall take *during coverture* the nationality of her husband; but upon termination of the marital relation by death or absolute divorce she may *revert* to her American citizenship by registering within one year as an American citizen at the most convenient American consulate or by returning to reside in the

consequence of the common-law fiction of a unity of interest in the marital community. During coverture the privileges and obligations of a woman's citizenship gave way to the dominance of her husband's. Prior to the Act of March 2, 1907, the Department of State declined to issue passports to American-born women who were married to aliens. 3 Moore, 454; 3 Hackworth, 247. The Attorney General ruled that a woman in such circumstances was not subject to an income tax imposed on all citizens of the United States residing abroad. 13 Op. Atty. Gen. 128. Several courts held that during the duration of a marriage consummated prior to the Act between an American-born woman and an alien, a court may entertain a petition for her naturalization. *In re Wohlgemuth,* 35 F. 2d 1007; *In re Krausmann,* 28 F. 2d 1004; *In re Page,* 12 F. 2d 135. Cf. *Pequignot* v. *Detroit,* 16 F. 211.

[21] S. Res. 30, 59th Cong., 1st Sess.; H. R. Rep. No. 4784, 59th Cong., 1st Sess.

[22] H. R. Doc. No. 326, 59th Cong., 2d Sess. 29. The Department's covering letter makes abundantly clear that marriage was not to result in "expatriation." *Id.,* at 3.

United States if she is abroad; or if she is in the United States by continuing to reside therein." (Emphasis added.)

This principle of "reversion of citizenship" was a familiar one in our own law,[23] and the law of foreign states.[24] The statute was merely declarative of the law as it was then

---

[23] Consult, generally, 3 Moore, § 410 (2) ("Reversion of Nationality"); Van Dyne, Naturalization, 242–255. Numerous cases contain references to a woman's "reverting" to United States citizenship after the termination of her marriage to an alien. *E. g., Petition of Zogbaum*, 32 F. 2d 911, 913; *Petition of Drysdale*, 20 F. 2d 957, 958; *In re Fitzroy*, 4 F. 2d 541, 542. The Department of State adopted the same interpretation. In 1890 Secretary Blaine declared the view of the Department that:

"The marriage of an American woman to a foreigner does not completely divest her of her original nationality. *Her American citizenship is held for most purposes to be in abeyance during coverture,* but to be susceptible of revival by her return to the jurisdiction and allegiance of the United States." (Emphasis added.) Foreign Rel. U. S. 1890, 301.

In 1906 Secretary Root stated:

"Under the practice of the Department of State a widow or a woman who has obtained an absolute divorce, being an American citizen and who has married an alien, must return to the United States, or must have her residence here in order to have her American citizenship revert on becoming *femme sole*." Foreign Rel. U. S. 1906, Pt. 2, 1365.

[24] Consult, generally, 3 Moore, 458–462. H. R. Doc. No. 326, 59th Cong., 2d Sess. 269–538, a report by the Department of State which Congress requested prior to its Act of March 2, 1907, contains a digest of the nationality laws of forty-four countries. Twenty-five of those provided in widely varying terms that upon marriage a woman's citizenship should follow that of her husband. Of these twenty-five, all but two made special provision for the woman to recover her citizenship upon termination of the marriage by compliance with certain formalities demonstrative of the proper intent, and in every instance wholly different from the ordinary naturalization procedures.

understood.[25]   Although the opinion in *Mackenzie* v.
*Hare* contains some reference to termination of citizen-
ship, the reasoning is consistent with the terms of the
statute that was upheld.   Thus, the Court speaks of
Mrs. Mackenzie's having entered a "condition," 239 U. S.,
at 312, not as having surrendered her citizenship.
"Therefore," the Court concludes, *"as long as the relation
lasts* it is made tantamount to expatriation."   *Ibid.*
(Emphasis added.)

A decision sustaining a statute that relies upon the
unity of interest in the marital community—a common-
law fiction now largely a relic of the past—may itself be
outdated.[26]   However that may be, the foregoing demon-

---

[25] *In re Wohlgemuth*, 35 F. 2d 1007; *In re Krausmann*, 28 F. 2d
1004; *Petition of Drysdale*, 20 F. 2d 957; *In re Page*, 12 F. 2d 135.

In fact, Congressman Perkins, supporting the bill on the floor of
the House, explained its effect in these words:
"The courts have decided that a woman takes the citizenship of her
husband, only the decisions of the courts provide no means by which
she may retake the citizenship of her own country on the expiration
of the marital relation.  This bill contains nothing new in that respect,
except a provision that when the marital relation is terminated the
woman may then retake her former citizenship."  41 Cong. Rec. 1465.

Cases discussing the pre-1907 law generally held that a woman did
not lose her citizenship by marriage to an alien, although she might
bring about that result by other acts (such as residing abroad after
the death of her husband) demonstrating an intent to relinquish that
citizenship.  *E. g., Shanks* v. *Dupont*, 3 Pet. 242; *In re Wright*, 19
F. Supp. 224; *Petition of Zogbaum*, 32 F. 2d 911; *In re Lynch*, 31 F.
2d 762; *Petition of Drysdale*, 20 F. 2d 957; *In re Fitzroy*, 4 F. 2d
541; *Wallenburg* v. *Missouri Pacific R. Co.*, 159 F. 217; *Ruckgaber*
v. *Moore*, 104 F. 947; *Comitis* v. *Parkerson*, 56 F. 556.  This was also
the view of the Department of State.  3 Moore, 449–450; 3 Hack-
worth, 247–248.

[26] The marriage provisions of the 1907 legislation were substantially
repealed by the 1922 Cable Act, 42 Stat. 1021, and the last remnants
of the effect of marriage on loss of citizenship were eliminated in
1931.  46 Stat. 1511.  See Roche, The Loss of American Nationality,
99 U. of Pa. L. Rev. 25, 47–49.

strates that *Mackenzie* v. *Hare* should not be understood to sanction a power to divest citizenship. Rather this case, like *Savorgnan,* simply acknowledges that United States citizenship can be abandoned, temporarily or permanently, by conduct showing a voluntary transfer of allegiance to another country.

The background of the congressional enactment pertinent to this case indicates that Congress was proceeding generally in accordance with this approach. After the initial congressional designation in 1907 of certain actions that were deemed to be an abandonment of citizenship, it became apparent that further clarification of the problem was necessary. In 1933 President Roosevelt, acting at the request of the House Committee on Immigration and Naturalization,[27] established a Committee of Cabinet members to prepare a codification and revision of the nationality laws.[28] The Committee, composed of the Secretary of State, the Attorney General and the Secretary of Labor, spent five years preparing the codification that became the Nationality Act of 1940 and submitted their draft in 1938. It is evident that this Committee did not believe citizenship could be divested under the Government's general regulatory powers. Rather, it adopted the position that the citizen abandons his status by compromising his allegiance. In its letter submitting the proposed codification to the President, the Committee described the loss-of-nationality provisions in these words: [29]

> "They are merely intended to deprive persons of American nationality when such persons, *by their own acts, or inaction, show that their real attachment is to the foreign country and not to the United States."* (Emphasis added.)

---

[27] See 86 Cong. Rec. 11943.

[28] Exec. Order No. 6115, April 25, 1933.

[29] Codification of the Nationality Laws of the United States, H. R. Comm. Print, Pt. 1, 76th Cong., 1st Sess. vii.

Furthermore, when the draft code was first discussed by the House Committee on Immigration and Naturalization—the only legislative group that subjected the codification to detailed examination [30]—it was at once recognized that the status of citizenship was protected from congressional control by the Fourteenth Amendment. In considering the situation of a native-born child of alien parentage, Congressmen Poage and Rees, members of the committee, and Richard Flournoy, the State Department representative, engaged in the following colloquy: [31]

"Mr. POAGE. Isn't that based on the constitutional provision that all persons born in the United States are citizens thereof?

"Mr. FLOURNOY. Yes.

"Mr. POAGE. In other words, it is not a matter we have any control over.

"Mr. FLOURNOY. No; and no one wants to change that.

"Mr. POAGE. No one wants to change that, of course.

"Mr. FLOURNOY. We have control over citizens born abroad, and we also have control over the question of expatriation. We can provide for expatriation. No one proposes to change the constitutional provisions.

"Mr. REES. We cannot change the citizenship of a man who went abroad, who was born in the United States.

"Mr. FLOURNOY. You can make certain acts of his result in a loss of citizenship.

"Mr. REES. Surely, that way."

---

[30] The bill was considered by the House Committee on Immigration and Naturalization and its subcommittee. Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, 76th Cong., 1st Sess. The Senate did not hold hearings on the bill.

[31] Hearings, at 37–38.

It is thus clear that the purpose governing the formulation of most of the loss-of-nationality provisions of the codification was the specification of acts that would of themselves show a voluntary abandonment of citizenship. Congress did not assume it was empowered to use denationalization as a weapon to aid in the exercise of its general powers. Nor should we.

Section 401 (e) of the 1940 Act added a new category of conduct that would result in loss of citizenship:

> "Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory . . . ."

The conduct described was specifically represented by Mr. Flournoy to the House Committee as indicative of "a choice of the foreign nationality," just like "using a passport of a foreign state as a national thereof." [32]

The precise issue posed by Section 401 (e) is whether the conduct it describes invariably involves a dilution of undivided allegiance sufficient to show a voluntary abandonment of citizenship. Doubtless under some circumstances a vote in a foreign election would have this effect. For example, abandonment of citizenship might result if the person desiring to vote had to become a foreign national or represent himself to be one.[33] Conduct of this sort is apparently what Mr. Flournoy had in mind when he discussed with the committee the situation of an American-born youth who had acquired Canadian citizenship through the naturalization of his parents. Mr. Flournoy suggested that the young man might manifest

---

[32] *Id.*, at 132. The passport provision was apparently deleted by the subcommittee, for it does not appear in the version of the bill that was printed when hearings resumed before the full committee on May 2, 1940. *Id.*, at 207.

[33] Cf. *In the Matter of P———*, 1 I. & N. Dec. 267 (this particular election in Canada was open only to British subjects).

an election of nationality by taking advantage of his Canadian citizenship and voting "as a Canadian." [34] And even the situation that bothered Committee Chairman Dickstein—Americans voting in the Saar plebiscite—might under some circumstances disclose conduct tantamount to dividing allegiance. Congressman Dickstein expressed his concern as follows: [35]

> "I know we have had a lot of Nazis, so-called American citizens, go to Europe who have voted in the Saar for the annexation of territory to Germany, and Germany says that they have the right to participate and to vote, and yet they are American citizens."

There might well be circumstances where an American shown to have voted at the behest of a foreign government to advance its territorial interests would compromise his native allegiance.

The fatal defect in the statute before us is that its application is not limited to those situations that may rationally be said to constitute an abandonment of citizenship. In specifying that any act of voting in a foreign political election results in loss of citizenship, Congress has employed a classification so broad that it encompasses conduct that fails to show a voluntary abandonment of American citizenship.[36] "The connection between the fact proved and that presumed is not sufficient." *Manley* v. *Georgia*, 279 U. S. 1, 7; see also *Tot* v. *United States*, 319 U. S. 463; *Bailey* v. *Alabama*, 219 U. S. 219. The

---

[34] Hearings, at 98.

[35] *Id.*, at 286–287.

[36] The broad sweep of the statute was specifically called to the attention of the committee by Mr. Henry F. Butler. Hearings, at 286–287. Mr. Butler also submitted a brief, suggesting that the coverage of the statute be limited to those voting "in a manner in which only nationals of such foreign state or territory are eligible to vote or participate." *Id.*, at 387.

reach of this statute is best indicated by a decision of a former attorney general, holding that an American citizen lost her citizenship under Section 401 (e) by voting in an election in a Canadian town on the issue of whether beer and wine should be sold.[37] Voting in a foreign election may be a most equivocal act, giving rise to no implication that allegiance has been compromised. Nothing could demonstrate this better than the political history of this country. It was not until 1928 that a presidential election was held in this country in which no alien was eligible to vote.[38] Earlier in our history at least 22 States had extended the franchise to aliens. It cannot be seriously contended that this Nation understood the vote of each alien who previously took advantage of this privilege to be an act of allegiance to this country, jeopardizing the alien's native citizenship. How then can we attach such significance to any vote of a United States citizen in a foreign election? It is also significant that of 84 nations whose nationality laws have been compiled by the United Nations, only this country specifically designates foreign voting as an expatriating act.[39]

My conclusions are as follows. The Government is without power to take citizenship away from a native-born or lawfully naturalized American. The Fourteenth

---

[37] *In the Matter of F————*, 2 I. & N. Dec. 427.

[38] Aylsworth, The Passing of Alien Suffrage, 25 Am. Pol. Sci. Rev. 114.

[39] Laws Concerning Nationality, U. N. Doc. No. ST/LEG/SER. B/4 (1954). The statutes of Andorra (191 sq. mi.; 5,231 pop.) provide for loss of nationality for a citizen who "exercises political rights in another country," *id.*, at 10, and this very likely includes voting.

Of course, it should be noted that two nations, Romania and Russia, have statutes providing that upon decree of the government citizenship can be withdrawn, apparently for any reason. *Id.*, at 396, 463.

Amendment recognizes that this priceless right is immune from the exercise of governmental powers. If the Government determines that certain conduct by United States citizens should be prohibited because of anticipated injurious consequences to the conduct of foreign affairs or to some other legitimate governmental interest, it may within the limits of the Constitution proscribe such activity and assess appropriate punishment. But every exercise of governmental power must find its source in the Constitution. The power to denationalize is not within the letter or the spirit of the powers with which our Government was endowed. The citizen may elect to renounce his citizenship, and under some circumstances he may be found to have abandoned his status by voluntarily performing acts that compromise his undivided allegiance to his country. The mere act of voting in a foreign election, however, without regard to the circumstances attending the participation, is not sufficient to show a voluntary abandonment of citizenship. The record in this case does not disclose any of the circumstances under which this petitioner voted. We know only the bare fact that he cast a ballot. The basic right of American citizenship has been too dearly won to be so lightly lost.

I fully recognize that only the most compelling considerations should lead to the invalidation of congressional action, and where legislative judgments are involved, this Court should not intervene. But the Court also has its duties, none of which demands more diligent performance than that of protecting the fundamental rights of individuals. That duty is imperative when the citizenship of an American is at stake—that status, which alone, assures him the full enjoyment of the precious rights conferred by our Constitution. As I see my duty in this case, I must dissent.

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

While I join the opinion of The Chief Justice, I wish to add a word. The philosophy of the opinion that sustains this statute is foreign to our constitutional system. It gives supremacy to the Legislature in a way that is incompatible with the scheme of our written Constitution. A decision such as this could be expected in England where there is no written constitution, and where the House of Commons has the final say. But with all deference, this philosophy has no place here. By proclaiming it we forsake much of our constitutional heritage and move closer to the British scheme. That may be better than ours or it may be worse. Certainly it is not ours.

We deal here with the right of citizenship created by the Constitution. Section 1, cl. 1, of the Fourteenth Amendment states "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." As stated by the Court in the historic decision *United States* v. *Wong Kim Ark,* 169 U. S. 649, 702, "Citizenship by naturalization can only be acquired by naturalization under the authority and in the forms of law. But citizenship by birth is established by the mere fact of birth under the circumstances defined in the Constitution."

What the Constitution grants the Constitution can take away. But there is not a word in that document that covers expatriation. The numerous legislative powers granted by Art. I, § 8, do not mention it. I do not know of any legislative power large enough and powerful enough to modify or wipe out rights granted or created by § 1, cl. 1, of the Fourteenth Amendment.

Our decisions have never held that expatriation can be imposed. To the contrary, they have assumed that

expatriation was a voluntary relinquishment of loyalty to one country and attachment to another. Justice Paterson spoke of expatriation in *Talbot* v. *Janson,* 3 Dall. 133, 153, as "a departure with intention to leave this country, and settle in another." The loss of citizenship in this country without its acquisition in another country was to him the creation of "a citizen of the world"—a concept that is "a creature of the imagination, and far too refined for any republic of ancient or modern times." *Ibid.*

So far as I can find, we have, prior to this day, never sustained the loss of a native-born American citizenship unless another citizenship was voluntarily acquired. That was true both in *Mackenzie* v. *Hare,* 239 U. S. 299, and *Savorgnan* v. *United States,* 338 U. S. 491. We should look to their facts, not to loose statements unnecessary for the decisions. In the *Mackenzie* case it was the marriage of a native-born woman to an alien that caused the loss of one nationality and the acquisition of another. In the *Savorgnan* case the native-born American citizen became naturalized in Italy. In this case Perez did vote in a foreign election of some kind. But as THE CHIEF JUSTICE has clearly shown, § 401 (e) of the Nationality Act of 1940 "is not limited to those situations that may rationally be said to constitute an abandonment of citizenship." *Ante,* p. 76.

Our landmark decision on expatriation is *Perkins* v. *Elg,* 307 U. S. 325, where Chief Justice Hughes wrote for the Court. The emphasis of that opinion is that "Expatriation is the voluntary renunciation or abandonment of nationality and allegiance." *Id.,* at 334.

Today's decision breaks with that tradition. It allows Congress to brand an ambiguous act as a "voluntary renunciation" of citizenship when there is no requirement and no finding that the citizen transferred his loyalty from this country to another. This power is found in the

power of Congress to regulate foreign affairs. But if voting abroad is so pregnant with danger that Congress can penalize it by withdrawing the voter's American citizenship, all citizens should be filled with alarm. Some of the most heated political discussions in our history have concerned foreign policy. I had always assumed that the First Amendment, written in terms absolute, protected those utterances, no matter how extreme, no matter how unpopular they might be. Yet if the power to regulate foreign affairs can be used to deprive a person of his citizenship because he voted abroad, why may not it be used to deprive him of his citizenship because his views on foreign policy are unorthodox or because he disputed the position of the Secretary of State or denounced a Resolution of the Congress or the action of the Chief Executive in the field of foreign affairs? It should be remembered that many of our most heated controversies involved assertion of First Amendment rights respecting foreign policy. The hated Alien and Sedition Laws grew out of that field.[1] More recently the rise of fascism and com-

---

[1] Miller, Crisis in Freedom (1951), 167–168, states the Federalist case for those laws:

"As in the case of the Alien Act, the Federalists justified the Sedition Law by citing the power of Congress to provide for the common defense and general welfare, and the inherent right of every government to act in self-preservation. It was passed at a time of national emergency when, as a member of Congress said, 'some gentlemen say we are at war, and when all believe we must have war.' 'Threatened by *faction,* and actually at *hostility* with a foreign and perfidious foe abroad,' the Sedition Act was held to be 'necessary for the safety, perhaps the existence of the Government.' Congress could not permit subversive newspapers to 'paralyze the public arm, and weaken the efforts of Government for the defense of the country.' The wiles of France and its adherents were as dangerous as its armies: 'Do not the Jacobin fiends of France use falsehood and all the arms of hell,' asked William Cobbett, 'and do they not run like half famished

munism has had profound repercussions here. Could one who advocated recognition of Soviet Russia in the 1920's be deprived of his citizenship? Could that fate befall one who was a Bundist [2] in the late 1930's or early 1940's and extolled Hitler? Could it happen in the 1950's to one who pleaded for recognition of Red China or who proclaimed against the Eisenhower Doctrine in the Middle East? No doubt George F. Kennan "embarrassed" our foreign relations when he recently spoke over the British radio.[3] Does the Constitution permit Congress to cancel his citizenship? Could an American who violated his passport restrictions and visited Red China be deprived of his citizenship? Or suppose he trades with those under a ban. To many people any of those acts would seem much more heinous than the fairly innocent act of voting abroad. If casting a ballot abroad is sufficient to deprive an American of his citizenship, why could not like penalties be imposed on the citizen who expresses disagreement with his Nation's foreign policy in any of the ways enumerated?

The fact that First Amendment rights may be involved in some cases and not in others seems irrelevant. For the grant of citizenship by the Fourteenth Amendment is clear and explicit and should withstand any invasion of the legislative power.

What the Court does is to make it possible for any one of the many legislative powers to be used to wipe out or modify specific rights granted by the Constitution, provided the action taken is moderate and does not do violence to the sensibilities of a majority of this Court. The examples where this concept of Due Process has been

---

wolves to accomplish the destruction of this country?' If Congress had failed to take every precautionary measure against such danger, the blood of the Republic would have been upon its hands."

[2] Cf. *Keegan* v. *United States,* 325 U. S. 478.

[3] See Kennan, Russia, The Atom and the West (1957).

used to sustain state action [4] as well as federal action,[5] which modifies or dilutes specific constitutional guarantees, are numerous.  It is used today drastically to revise the express command of the first Clause of § 1 of the Fourteenth Amendment.  A right granted by the Constitution—whether it be the right to counsel or the right to citizenship—may be waived by the citizen.[6]  But the waiver must be *first* a voluntary act and *second* an act consistent with a surrender of the right granted.  When Perez voted he acted voluntarily.  But, as shown, § 401 (e) does not require that his act have a sufficient relationship to the relinquishment of citizenship—nor a sufficient quality of adhering to a foreign power.  Nor did his voting abroad have that quality.

The decision we render today exalts the Due Process Clause of the Fifth Amendment above all others.  Of course any power exercised by the Congress must be asserted in conformity with the requirements of Due Process.  *Tot* v. *United States,* 319 U. S. 463; *United States* v. *Harriss,* 347 U. S. 612; *Lambert* v. *California,* 355 U. S. 225.  But the requirement of Due Process is a limitation on powers granted, not the means whereby rights granted by the Constitution may be wiped out or watered down.  The Fourteenth Amendment grants citizenship to the native-born, as explained in *United States* v. *Wong Kim Ark, supra.*  That right may be waived or surrendered by the citizen.  But I see no constitutional

---

[4] See *Betts* v. *Brady,* 316 U. S. 455; *In re Summers,* 325 U. S. 561; *Adamson* v. *California,* 332 U. S. 46; *Bute* v. *Illinois,* 333 U. S. 640; *Feiner* v. *New York,* 340 U. S. 315; *Breard* v. *Alexandria,* 341 U. S. 622; *Adler* v. *Board of Education,* 342 U. S. 485; *Beauharnais* v. *Illinois,* 343 U. S. 250; *In re Groban,* 352 U. S. 330; *Breithaupt* v. *Abram,* 352 U. S. 432.

[5] *United Public Workers* v. *Mitchell,* 330 U. S. 75; *American Communications Assn.* v. *Douds,* 339 U. S. 382; *Dennis* v. *United States,* 341 U. S. 494.

[6] *E. g., Adams* v. *McCann,* 317 U. S. 269, 275.

method by which it can be taken from him. Citizenship, like freedom of speech, press, and religion, occupies a preferred position in our written Constitution, because it is a grant absolute in terms. The power of Congress to withhold it, modify it, or cancel it does not exist. One who is native-born may be a good citizen or a poor one. Whether his actions be criminal or charitable, he remains a citizen for better or for worse, except and unless he voluntarily relinquishes that status. While Congress can prescribe conditions for voluntary expatriation, Congress cannot turn white to black and make any act an act of expatriation. For then the right granted by the Fourteenth Amendment becomes subject to regulation by the legislative branch. But that right has no such infirmity. It is deeply rooted in history, as *United States* v. *Wong Kim Ark, supra,* shows. And the Fourteenth Amendment put it above and beyond legislative control.

That may have been an unwise choice. But we made it when we adopted the Fourteenth Amendment and provided that the native-born is an American citizen. Once he acquires that right there is no power in any branch of our Government to take it from him.

Memorandum of Mr. Justice Whittaker.

Though I agree with the major premise of the majority's opinion—that Congress may expatriate a citizen for an act which it may reasonably find to be fraught with danger of embroiling our Government in an international dispute or of embarrassing it in the conduct of foreign affairs—I cannot agree with the result reached, for it seems plain to me that § 401 (e) is too broadly written to be sustained upon that ground. That section, so far as here pertinent, expatriates an American citizen simply for "voting in a political election in a foreign state." Voting in a political election in a particular foreign state may be open to aliens under the law of that state, as it was in presidential elec-

tions in the United States until 1928 as the dissenting opinion of THE CHIEF JUSTICE observes. Where that is so—and this record fails to show that petitioner's act of voting in a political election in Mexico in 1946 was not entirely lawful under the law of that state—such legalized voting by an American citizen cannot reasonably be said to be fraught with danger of embroiling our Government in an international dispute or of embarrassing it in the conduct of foreign affairs, nor, I believe, can such an act—entirely legal under the law of the foreign state—be reasonably said to constitute an abandonment or any division or dilution of allegiance to the United States. Since these are my convictions, I dissent from the majority's opinion and join in so much of the dissenting opinion of THE CHIEF JUSTICE as expresses the view that the act of a citizen of the United States in voting in a foreign political election which is legally open to aliens under the law of that state cannot reasonably be said to constitute abandonment or any division or dilution of allegiance to the United States.

This leaves open the question presented respecting the constitutionality of § 401 (j), but inasmuch as the majority have found it unnecessary to adjudicate the constitutionality of that section in this case, it would be wholly fruitless for me now to reach a conclusion on that question, and I neither express nor imply any views upon it. Limiting myself to the issue decided by the majority, I dissent.