# CONSTITUTIONALITY OF SECTION 7054 OF THE FISCAL YEAR 2009 FOREIGN APPROPRIATIONS ACT

*Section 7054 of the Fiscal Year 2009 Department of State, Foreign Operations, and Related Programs Appropriations Act, which purports to prohibit all funds made available under title I of that Act from being used to pay the expenses for any United States delegation to a specialized UN agency, body, or commission that is chaired or presided over by a country with a government that the Secretary of State has determined supports international terrorism, unconstitutionally infringes on the President's authority to conduct the Nation's diplomacy, and the State Department may disregard it.*

June 1, 2009

## MEMORANDUM OPINION FOR THE ACTING LEGAL ADVISER DEPARTMENT OF STATE

You have asked for an opinion regarding section 7054 of the Fiscal Year 2009 Department of State, Foreign Operations, and Related Programs Appropriations Act ("Foreign Appropriations Act"), which is division H of the Fiscal Year 2009 Omnibus Appropriations Act (H.R. 1105) ("Omnibus Act"), Pub. L. No. 111-8, 123 Stat. 524.[1]  The President signed the Omnibus Act into law on March 11, 2009.  Section 7054 purports to prohibit all funds made available under title I of the Foreign Appropriations Act from being used to pay the expenses for any United States delegation to a specialized United Nations ("U.N.") agency, body, or commission that is chaired or presided over by a country with a government that the Secretary of State ("Secretary") has determined supports international terrorism.  You have asked whether section 7054 prevents the State Department from using title I funds for the prohibited function.  We conclude that by purporting to bar the State Department from using title I funds for that function, section 7054 unconstitutionally infringes on the President's authority to conduct the Nation's diplomacy, and the State Department may disregard it.

## I.

Section 7054 provides as follows:

> None of the funds made available under title I of this Act may be used to pay expenses for any United States delegation to any specialized agency, body, or commission of the United Nations if such commission is chaired or presided over by a country, the government of which the Secretary of State has determined, for purposes of section 6(j)(1) of the Export Administration Act of 1979 (50 U.S.C. app. 2405(j)(1)), supports international terrorism.

Section 6(j)(1) of the Export Administration Act ("EAA") mandates a license for the export of goods to a country the government of which the Secretary has determined "has repeatedly

---

[1]  *See* Letter for David Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Joan E. Donoghue, Acting Legal Adviser, Department of State (May 4, 2009) ("Donoghue Letter").

provided support for acts of international terrorism" ("terrorist list state").[2]  The limitation imposed by section 7054 applies only to funds made available by title I of the Foreign Appropriations Act.  You have informed us, however, that title I is the only source of appropriated funds currently available to the State Department for a number of purposes related to the administration of foreign affairs, including the carrying out of diplomatic and consular programs.  You have further explained that title I appropriations are the only operating funds available to pay for State Department delegations to specialized U.N. entities.  *See* State Department Request for Confirmation of the Views of the Office of Legal Counsel on Section 7054 at 3 (May 4, 2009) ("State Request") (attachment to Donoghue Letter).  Section 7054 would thus effectively preclude the State Department from including any representatives in U.S. delegations to any specialized U.N. agency, commission or body chaired by a terrorist list state.  You have also informed us that most such government delegations are headed by a State Department official and include one or more additional State Department officials.  *See* State Request at 3.

> In signing the Omnibus Act, President Obama issued the following statement:
>
> Certain provisions of the bill, in titles I and IV of Division B, title IV of Division E, and title VII of Division H, would unduly interfere with my constitutional authority in the area of foreign affairs by effectively directing the Executive on how to proceed or not proceed in negotiations or discussions with international organizations and foreign governments.  I will not treat these provisions as limiting my ability to negotiate and enter into agreements with foreign nations.

Daily Comp. Pres. Doc. No. 2009-00145 (Mar. 11, 2009) (President Obama's Statement on Signing the Omnibus Appropriations Act, 2009).  Section 7054 is within title VII of division H, and purports to "effectively direct[] the Executive on how to proceed or not proceed in negotiations or discussions with international organizations and foreign governments."  Thus, although the President's signing statement did not identify section 7054 specifically, it encompasses that provision.

---

[2]  You have informed us that all terrorist list states were so designated by the Secretary pursuant to the EAA.  The authority granted by the EAA, however, terminated on August 20, 2001.  *See* 50 U.S.C. app. § 2419 (2000).  That fact does not alter our analysis.  Since the EAA terminated, the President, acting under the authority of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706 (2000 & West Supp. 2008), has annually issued executive orders that adopt the provisions of the EAA and that continue Executive Branch actions taken initially under the authority of the EAA.  *See, e.g.*, Notice of the President, Continuing of Emergency Regarding Export Control Regulations, 73 Fed. Reg. 43603 (2008); Exec. Order No. 13222, 3 C.F.R. 783 (2001). (The President also issued similar orders covering brief, pre-August 20, 2001 periods during which the EAA had lapsed and Congress had not yet acted to renew it.  *See, e.g.,* Exec. Order No. 12470, 3 C.F.R. 168 (1984); Exec. Order No. 12444, 3 C.F.R. 214 (1984).).  Congress has recognized and ratified this practice.  *See* Pub. L. No. 108-458, § 7102(c)(3), 118 Stat. 3638, 3776 (2004) (providing that "[t]he President shall implement" certain amendments to section 6(j) of the EAA "by exercising the authorities of the President under [IEEPA]").  In light of this history, we believe that Congress intended the reference in section 7054 to determinations "for purposes of 6(j)(1) of the [EAA]" to encompass, at a minimum, determinations that the Secretary made prior to EAA's termination, but which retain their force as a result of the President's exercise of his authority under IEEPA.

The same restriction on the use of appropriated funds has appeared in successive appropriations acts since fiscal year 2005.[3] President Bush indicated in signing statements accompanying these appropriations acts that the Executive Branch would construe such restrictions as "advisory."[4] Consistent with President Bush's direction, the Department sent representatives to participate from January 19, 2009 through January 23, 2009 in a session of a U.N. specialized body—the executive board of the United Nations Development Program ("UNDP") and the United Nations Population Fund ("UNFPA")—that was chaired at the time by Iran, a terrorist list state. *See* State Request at 4. Another meeting of the executive board of UNDP/UNFPA, which Iran still chairs, is scheduled for May 26, 2009 to June 5, 2009, and the State Department—the lead U.S. participant in the proceedings of this body—believes it would be advantageous to United States foreign policy objectives to send State Department officials to accompany the U.S. delegation. *See id.* Moreover, because the State Department is contemplating participation in other upcoming meetings of specialized U.N. entities that may fall within the restriction imposed by section 7054, and because the Department may receive little prior notice that a terrorist list state will chair a particular U.N. entity in the future, you have asked for more general guidance on whether and under what conditions the Department must comply with section 7054. *See id.* at 5.

## II.

As noted, President Bush announced in previous signing statements that the Executive Branch would construe as advisory restrictions that are functionally identical to section 7054. *See* supra note 4. Were such a construction available here, there would be no need to resolve the question of section 7054's constitutionality, and we are mindful that "[t]he executive branch has an obligation to attempt, insofar as is possible, to construe a statute so as to preserve its constitutionality." Memorandum to the Honorable Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Myers Amendment* at 11 (Aug. 30, 1977). In our view, however, section 7054 is not susceptible to a

---

[3] *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, div. J (Department of State, Foreign Operations, and Related Programs Appropriations Act), § 112, 121 Stat. 1844, 2288 (2007); Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-108, § 637, 119 Stat. 2290, 2347 (2005); Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. B (Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act), § 627, 118 Stat. 2809, 2920 (2004); *cf.* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, div. B (Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations), § 635, 118 Stat 3, 101 (2004) (prohibition limited to payment of expenses for delegation to United Nations Human Rights Commission, if chaired by state supporter of terrorism).

[4] *See* 41 Weekly Comp. Pres. Doc. 1745, 1764 (Nov. 22, 2005) ("The executive branch shall construe as advisory the provisions of the Act that purport to direct or burden the Executive's conduct of foreign relations, including the authority to recognize foreign states and negotiate international agreements on behalf of the United States . . . . These provisions include section[] . . . 637.") (President Bush's statement on signing the Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006); 40 Weekly Comp. Pres. Doc. 2924, 2924 (Dec. 8, 2004) ("The executive branch shall construe as advisory provisions of the [Consolidated Appropriations Act] that purport to direct or burden the Executive's conduct of foreign relations . . . . Such provisions include: in the Commerce-Justice-State Appropriations Act, section[] . . . 627") (President Bush's statement on signing the Consolidated Appropriations Act, 2005); *cf.* 40 Weekly Comp. Pres. Doc. 137, 137 (Jan. 23, 2004) ("The executive branch shall construe as advisory the provisions of the Act that purport to . . . direct or burden the Executive's conduct of foreign relations, including section[] . . . 635 of the Commerce, Justice, State Appropriations Act.") (President Bush's statement on signing the Consolidated Appropriations Act, 2004).

saving construction. Congress's injunction—"None of the funds made available under title I of [the Foreign Appropriations Act] may be used . . . ."—is unambiguously phrased in mandatory terms, and we see no evidence that Congress intended the word "may" to mean "should." Section 7054 is "plain and unambiguous," *United States v. Monsanto*, 491 U.S. 600, 606 (1989), and the canon of constitutional avoidance "has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001); *see also United States v. Locke*, 471 U.S. 84, 96 (1985) (a court cannot "press statutory construction to the point of disingenuous evasion even to avoid a constitutional question") (internal quotation marks omitted). Therefore, we do not think that section 7054 can be construed as merely advisory, even to avoid the serious constitutional question we now address.

## III.

In our view, section 7054 impermissibly interferes with the President's authority to manage the Nation's foreign diplomacy. To be sure, a determination that a duly enacted statute unconstitutionally infringes on Executive authority must be "well-founded," Memorandum for the Heads of Executive Departments and Agencies, *Re: Presidential Signing Statements*, 74 Fed. Reg. 10669 (2009); *see also Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200-01 (1994), and Congress quite clearly possesses significant article I powers in the area of foreign affairs, including with respect to questions of war and neutrality, commerce and trade with other nations, foreign aid, and immigration.[5] As ample precedent demonstrates, however, Congress's power to legislate in the foreign affairs area does not include the authority to attempt to dictate the modes and means by which the President engages in international diplomacy with foreign countries and through international fora. Section 7054 constitutes an attempt to exercise just such authority: It effectively denies the President the use of his preferred agents—representatives of the State Department—to participate in delegations to specified U.N. entities chaired or presided over by certain countries. As this Office has explained, such statutory restrictions are impermissible because the President's constitutional authority to conduct diplomacy bars Congress from attempting to determine the "form and manner in which the United States . . . maintain[s] relations with foreign nations." *Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. 18, 21 (1992) (citing *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 38 (1990)).

The President's basic authority to conduct the Nation's diplomatic relations derives from his specific constitutional authorities to "make Treaties," to "appoint Ambassadors . . . and Consuls" (subject to Senate advice and consent), U.S. Const. art. II, § 2, cl. 2, and to "receive Ambassadors and other public Ministers," *id.* art. II, § 3. It also flows more generally from the President's status as Chief Executive, *id.* art. II, § 1, cl. 1, and from the requirement in article II,

---

[5] *See, e.g.*, *Perez v. Brownell*, 356 U.S. 44, 57 (1958) ("Although there is in the Constitution no specific grant to Congress of power to enact legislation for the effective regulation of foreign affairs, there can be no doubt of the existence of this power in the law-making organ of the Nation."), *overruled on other grounds*, *Afrovim v. Rusk*, 387 U.S. 253 (1967); *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893); *Hamdi v. Rumsfeld*, 542 U.S. 507, 582 (2004) (Thomas, J., dissenting) ("Congress, to be sure, has a substantial and essential role in both foreign affairs and national security."); *see generally* Louis Henkin, Foreign Affairs and the United States Constitution 72-80 (2d ed. 1996).

section 3 of the Constitution that the President "shall take Care that the Laws be faithfully executed."[6]  As a result of these authorities, it is well established that the President is "the constitutional representative of the United States in its dealings with foreign nations."  *United States v. Louisiana*, 363 U.S. 1, 35 (1960); *see also Ex parte Hennen*, 38 U.S. (13 Pet.) 225, 235 (1839) ("As the executive magistrate of the country, [the President] is the only functionary intrusted with the foreign relations of the nation.").  As John Marshall noted in his famous speech of March 7, 1800 before the House of Representatives (while still a member of that body), the Executive Branch is "entrusted with the whole foreign intercourse of the nation, with the negotiation of all its treaties, with the power of demanding a reciprocal performance of the article, which is accountable to the nation for the violation of its engagements, with foreign nations, and for the consequences resulting from such violation."  John Marshall, Speech of March 7, 1800, *in* 4 The Papers of John Marshall 104-05 (Charles T. Cullen ed., 1984).  The President is, in other words, the "organ" of the Nation's diplomatic relations.  Pacificus No. 1 (June 29, 1793), *reprinted in* 15 The Papers of Alexander Hamilton 33, 38 (Harold C. Syrett ed., 1969) (italics removed).

In addition, the Executive Branch has long adhered to the view that Congress is limited in its authority to regulate the President's conduct of diplomatic relations.  Specifically, it may not (as section 7054 would) place limits on the President's use of his preferred agents to engage in a category of important diplomatic relations, and thereby determine the form and manner in which the Executive engages in diplomacy.  Secretary of State Thomas Jefferson, for example, set forth this view in a legal opinion that he delivered to President Washington in the midst of an ongoing debate in the first Congress over a proposed amendment to a bill to fund the exercise of foreign relations—a bill that eventually became the Act Providing the Means of Intercourse Between the United States and Foreign Nations, ch. 22, 1 Stat. 128 (1790) ("Foreign Intercourse Appropriations Act").  *See* Opinion on the Powers of the Senate Respecting Diplomatic Appointments (Apr. 24, 1790), *reprinted in* 16 The Papers of Thomas Jefferson 378-80 (Julian P. Boyd ed., 1961).  The proposed amendment would have given the Senate a role in approving the President's assignments of particular grades of diplomats to particular foreign posts.  *See* 12 Documentary History of the First Federal Congress of the United States of America 68-83 (Helen E. Veit, et al. eds., 1994).[7]  Jefferson—objecting to what he believed to be the Senate's impermissible attempt to extend its advice and consent authority over treaties and presidential appointments to Executive determinations about the conduct of diplomacy—also shed light on the special role that the Constitution assigns to the President when it comes to the conduct of diplomatic relations.  "The transaction of business with foreign nations is Executive altogether . . . *except* as to such portions of it as are specially submitted to the Senate," Jefferson stated, with "*[e]xceptions* . . . to be construed strictly."  16 The Papers of Thomas Jefferson at 379.  In the course of objecting to the proposal at hand, Jefferson not only opined that "[t]he Senate is

---

[6]  *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-11 (1952)  (Frankfurter, J., concurring)); *see also* 4 The Papers of John Marshall at 104 (observing that President's duty "to execute the laws" supports his foreign affairs powers).

[7]  Congress ultimately rejected the proposed amendment, and the Foreign Intercourse Appropriations Act as enacted appropriated an unconditional annual diplomatic budget and made the President alone responsible for deciding how to spend the lump sum.  *See* 1 Stat. 128-29.

not supposed by the Constitution to be acquainted with the concerns of the Executive department . . . [they cannot] therefore be qualified to judge of the necessity which calls for a mission to any particular place . . . ," but also that "[a]ll this is left to the President." *Id. See also* 7 Op. Att'y Gen. 242, 250 (1855) (affirming Jefferson's view in concluding that the "power of determining when and at what places to appoint [consuls], and of what rank to appoint them[]" is constitutionally "intrusted to the sole discretion of the Executive").

The available evidence suggests that Washington understood John Jay and James Madison to share Jefferson's views as expressed in this opinion, both as to the constraints on the Senate's powers and the nature of the special diplomatic authorities the Constitution confers on the President. *See* Michael D. Ramsey, The Constitution's Text in Foreign Affairs 83 (2007) (noting Washington's observation in his diary that "Madison's 'opinion coincides with Mr. Jay's and Mr. Jefferson's—to wit—that they [*i.e.*, the Senate] have no Constitutional right to interfere with either [the destination or grade of diplomats], . . . their powers extending no farther than to an approbation or disapprobation of the person nominated by the President, *all the rest being Executive and vested in the President by the Constitution.*'") (quoting 4 Diaries of George Washington 122 (Apr. 27, 1790) (John Fitzpatrick ed., 1925)) (emphasis added). Indeed, prior to the Constitution's ratification, John Jay in *Federalist No. 64*, in explaining why the President should have the discretion to decide when to seek the Senate's advice on treaty negotiation, had sounded a similar theme:

> Those matters which in negotiations usually require the most secrecy and the most dispatch, are those preparatory and auxiliary measures which are not otherwise important in a national view, than as they tend to facilitate the attainment of the objects of the negotiation. For these, the president will find no difficulty to provide; and should any circumstance occur which requires the advice and consent of the senate, he may at any time convene them. Thus we see that the constitution provides that our negotiations for treaties shall have every advantage which can be derived from talents, information, integrity, and deliberate investigations, on the one hand, and from secrecy and dispatch on the other.

*The Federalist No. 64* at 205 (John Jay) (McLean's ed., 1787); *accord The Federalist No. 84* at 355 (Alexander Hamilton) ("[T]he management of foreign negotiations will naturally devolve upon [the President] according to general principles concerted with the Senate, and subject to their final concurrence.").

These Executive officials were not alone in taking the position that the President enjoys significant discretion in determining how to negotiate with foreign nations. Newspaper accounts of the House debate over the Foreign Intercourse Funding Act indicate that there was strong opposition to the proposed amendment (opposition which prompted Washington's request for the Jefferson opinion). *See* 12 Documentary History of the First Federal Congress of the United States of America at 68-83. According to one report, among the positions of the "considerable majority" in the House that rejected the amendment was that "intercourse with foreign nations is a trust specially committed to the President of the United States; and after the Legislature has made the necessary provision to enable him to discharge that trust, the manner how it shall be executed must rest with him." *Id.* at 72, 83.

Members of Congress expressed similar views in other contexts during the Nation's early history. In 1796, for example, Senator Robert Ellsworth, a future Supreme Court Justice, explained that "[n]either [the legislative nor the judicial] branch had a right to dictate to the President what he should answer [to foreign nations]. The Constitution left the whole business in his breast." 5 Annals of Congress 28, 32 (1796). And in 1816, the Senate Committee on Foreign Relations made similar arguments in a report to the full Senate opposing adoption of a proposed resolution recommending that the President pursue certain negotiations with Great Britain. *See* Compilation of Reports of the Senate Committee on Foreign Relations, S. Doc. No. 231, pt. 8, at 22-25 (1901). The report stated that:

> The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success. For his conduct he is responsible to the Constitution.

*Id.* at 24. "[T]he interference of the Senate in the direction of foreign negotiations" was, the Committee thought, "calculated to diminish that responsibility and thereby to impair the best security for the national safety." *Id.*

Consistent with these principles, Congress may by statute affirm the President's authority to determine whether, how, when, and through whom to engage in foreign diplomacy.[8] But when Congress takes the unusual step of purporting to impose statutory restrictions on this well recognized authority, the Executive Branch has resisted. For example, Congress enacted an appropriations rider in 1913, providing that "[h]ereafter the Executive shall not extend or accept any invitation to participate in any international congress, conference, or like event, without first having specific authority of law to do so." Act of Mar. 4, 1913, ch. 149, 37 Stat. 913 (1913) (codified at 22 U.S.C. § 262 (2006)). The Executive has not acted in accord with that requirement, *see* Henry M. Wriston, *American Participation in International Conferences*, 20 Am. J. Int'l L. 33, 40 (1926) (observing that "there is not a single case [since 1913] where the President secured from Congress authorization to accept an invitation to a conference of a political or diplomatic character," and that "since 1917 the whole practice of requesting Congress for authority to accept invitations to any sort of international conference has virtually fallen into disuse"), and the measure is now a "known dead letter," Louis Henkin, Foreign Affairs and the United States Constitution 118 (2d ed. 1996). Indeed, when first informed of the provision's existence (more than three years after its enactment), President Wilson reportedly termed it "utterly futile." Wriston at 39. Wilson's dismissive characterization accorded with the view, expressed in a leading treatise of the day, that the President "cannot be compelled by a resolution of either house or of both houses of Congress to exercise" his constitutional powers with respect to "instituting negotiations." Samuel B. Crandall, Treaties: Their Making and Enforcement 74 (2d ed. 1916).

---

[8] *See, e.g.*, 22 U.S.C. 287a (2006) ("[W]hen representing the United States in the respective organs and agencies of the United Nations, [U.S. representatives] shall, at all times, act in accordance with the instructions of the President transmitted by the Secretary of State unless other means of transmission is directed by the President.").

In more recent decades, the Executive has continued to object when Congress has attempted to impose limits on the form and manner by which the President exercises his diplomatic powers. In particular, the Executive has asserted on numerous occasions that the President possesses the "'exclusive authority to determine the time, scope, and objectives'" of international negotiations or discussions, including the authority "to determine the individuals who will" represent the United States in those diplomatic exchanges.[9] And this Office has "repeatedly objected on constitutional grounds to Congressional attempts to mandate the time, manner and content of diplomatic negotiations," including in the context of potential engagement with international fora. *See* Memorandum for Alan Kreczko, Legal Adviser, National Security Council, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: WTO Dispute Settlement Review Commission Act* at 3 (Feb. 9, 1995) ("Dellinger WTO Memo").

For example, we concluded that it would be unconstitutional for Congress to adopt joint resolutions mandating that the President enter negotiations to modify the rules of the World Trade Organization. *See id.* Relatedly, we determined that a legislative provision purporting to prevent the State Department from expending appropriated funds on delegates to an international conference unless legislative representatives were included in the delegation was an "impermissibl[e] interfere[nce]" with the President's "constitutional responsibility to represent the United States abroad and thus to choose the individuals through whom the Nation's foreign affairs are conducted." 14 Op. O.L.C. at 38, 41. And the Executive Branch has objected numerous times on constitutional grounds to legislative provisions purporting to preclude any U.S. government employee from negotiating with (or recognizing) the Palestine Liberation Organization ("PLO") or its representatives until the PLO had met certain conditions.[10]

---

[9]  14 Op. O.L.C. at 38, 41 (quoting II Pub. Papers Ronald Reagan 1541, 1542 (Dec. 22, 1987) (President Reagan's statement in signing the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)); *see also* Section 235A of the Immigration and Nationality Act, 24 Op. O.L.C. 276, 281 (2000) (same); 32 Weekly Comp. Pres. Doc. 2040, 2041 (Oct. 11, 1996) (President Clinton's statement on signing the Sustainable Fisheries Act) ("Under our Constitution, it is the President who articulates the Nation's foreign policy and who determines the timing and subject matter of our negotiations with foreign nations."); 27 Weekly Comp. Pres. Doc. 1527, 1528 (Oct. 28, 1991) (President Bush's statement on signing the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993) ("The Constitution . . . vests exclusive authority in the President to control the timing and substance of negotiations with foreign governments and to choose the officials who will negotiate on behalf of the United States."); *The President—Authority to Participate in International Negotiations—Trade Act of 1974 (19 U.S.C. § 2101)—Participation in Producer-Consumer Fora*, 2 Op. O.L.C. 227, 228 n.1 (1978) ("[W]e think it doubtful that the President's power to negotiate with foreign governments over subjects of national concern can ever be subject to unqualified restriction by statute."); *accord* Henkin at 42 ("As 'sole organ,' the President determines also how, when, where, and by whom the United States should make or receive communications, and there is nothing to suggest that he is limited as to time, place, form, or forum.").

[10]  *See, e.g.*, Memorandum for Carol T. Crawford, Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 2939* at 3 (Oct. 19, 1989); *see also* 21 Weekly Comp. Pres. Doc. 972, 973 (Aug. 8, 1985) (President Reagan's statement on signing the International Security and Development Cooperation Act of 1985) (objecting to such a provision as a "congressional effort to impose legislative restrictions or directions with respect to the conduct of international negotiations which, under article II of the Constitution, is a function reserved exclusively to the President"); *accord* 26 Weekly Comp. Pres. Doc. 266, 267 (Feb. 16, 1990) (President Bush's statement on signing the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991) (stating that provision "restrict[ing] the expenditure of appropriated funds for carrying on 'the current dialogue in the Middle East peace process with any [PLO representative]'" would, if "interpreted to prohibit negotiations with particular individuals under certain circumstances," "impermissibly limit my constitutional authority to negotiate with foreign organizations").

In objecting to one such provision, this Office explained that Congress "possesses no constitutional authority to forbid the President from engaging in diplomatic contacts." Memorandum for Carol T. Crawford, Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 2939* at 3 (Oct. 19, 1989). Other Executive Branch precedents are to similar effect. *See Bill To Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 126 (1995) (concluding that a proposed bill conditioning the State Department's ability to obligate certain appropriated funds upon the relocation of the United States's Israeli embassy to Jerusalem would constitute an unconstitutional invasion of the President's authority to determine the form and manner of the Nation's diplomatic relations); 16 Op. O.L.C. at 24-28 (deeming it an unconstitutional "interfere[nce] with the President's communications to foreign governments" and his "ability to conduct diplomacy" for Congress to preclude the State Department's use of appropriated funds to issue additional diplomatic passports of a type necessary for government employees to travel to certain Arab league countries); 15 Weekly Comp. Pres. Doc. 1434 (Aug. 15, 1979) (President Carter's statement on signing H.R. 3363) ("I believe that Congress cannot mandate the establishment of consular relations at a time and place unacceptable to the President.").[11]

Judicial support for the Executive Branch's position can be found in *Earth Island Institute v. Christopher*, 6 F.3d 648 (9th Cir. 1993). In that case, the United States Court of Appeals for the Ninth Circuit struck down a statute purporting to require the Secretary of State to initiate negotiations with, and otherwise engage, foreign governments for the purposes of developing and entering into international agreements for the protection of sea turtles. The court deemed the statute an unconstitutional "intru[sion] upon the conduct of foreign relations by the Executive." *Id.* at 653. Additional judicial support can be found in the Supreme Court's clear dicta in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936): "[T]he President alone has the power to speak or listen as a representative of the nation. . . . Into the field of negotiation the Senate cannot intrude; and Congress itself is powerless to invade it," *id.* at 319.

That the President possesses the exclusive power to determine how to conduct diplomacy with other nations does not mean that Congress is without relevant authority. For example, the Senate must approve the treaties the President negotiates, *see* U.S. Const. art. II, § 2, cl. 2, and Congress can, by a subsequently enacted statute, limit the effect of treaties, *see Whitney v. Robertson*, 124 U.S. 190, 194 (1888) (stating that if a treaty and a statute are inconsistent, "the one last in date will control the other"). The Senate may even refuse its consent to a treaty if an international organization makes entry into such treaty a necessary precondition of United States

---

[11] *See also Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182, 186 (1996) (proposed bill prohibiting the obligation or expenditure of appropriated funds by the Department of Defense for the activities of elements of the armed forces placed under the United Nations's operational or tactical control would "impermissibly undermin[e] the President's constitutional authority with respect to the conduct of diplomacy"); *Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 193 (1996) (legislative provision requiring the President to make a detailed certification before using appropriated funds to expand the United States's diplomatic presence in Vietnam constituted "an unconstitutional condition on the exercise of the President's" recognition power).

participation in the proceedings of that organization.[12] The statutory limitation at issue here, however, does not constitute such an exercise of Congress's legitimate authority in the area of foreign affairs; rather, it purports to restrict the President from engaging in diplomacy through international fora that are organized pursuant to a treaty to which the United States is a party. *See* United Nations Charter, Jun. 26, 1945, 59 Stat. 1031, 1031, 1213 (noting that Senate consented to ratification of U.N. Charter on July 28, 1948). Section 7054, in other words, seeks to regulate who may participate in the delegations the President may send to the international fora of an organization to which the United States belongs, and at which the United States would be received were its delegations to be sent.

Nor is the impact of section 7054 on the President's discretion to determine the "form and manner" of the Nation's diplomacy merely hypothetical. You have explained to us that "United Nations bodies and affiliated agencies are generally responsible for marshalling United Nations member state responses to issues that fall within their purview." State Request at 3. Accordingly, full U.S. participation in such bodies facilitates the type of direct diplomacy that is critically important to advancing U.S. objectives with respect to the issues under discussion. *Id.* at 4. Moreover, the decision to send a full complement of government representatives to a class of entities that are so centrally important to the business of the U.N. may affect the standing and influence of the U.S. within the community of nations and thereby have a deleterious effect on the President's diplomatic efforts more broadly. That Congress has purported to restrict the President's reliance on the State Department—the lead and most experienced and capable government agency with respect to U.N. relations*, see* 22 U.S.C. §§ 287, 287a (2006); *see also* State Request at 3-4—further heightens the extent to which section 7054 impermissibly restrains the President's authority. Indeed, with reference to the particular context of the upcoming meeting of the executive board of UNDP/UNFPA, you have explained that "prohibiting State Department participation . . . would significantly hinder direct U.S. engagement in important diplomatic efforts, undermining U.S. strategic foreign policy interests." State Request at 4.

For these reasons, section 7054's prevention of the inclusion of State Department representatives in delegations to the specified U.N. entities is unconstitutional.

**IV.**

Our conclusion is not affected by the fact that Congress has drafted its restriction as a prohibition on the use of appropriated funds rather than as a direct prohibition. Congress's spending power is undoubtedly broad, and, as a general matter, Congress may decline to appropriate money altogether for a particular function, or place binding conditions on the

---

[12] In addition, although the question is not settled, Congress may possess some authority to withdraw the United States from membership in an international organization—at least where the organization relates to a subject matter, such as foreign commerce, that falls within Congress's enumerated powers, U.S. Const. art. I, § 8, cl. 3. *See* Dellinger WTO Memo at 4-6; *cf.* Edward S. Corwin, The President: Office and Powers, 1787-1984, at 222 (5th ed. 1984) (arguing that Congress possesses "vast powers to determine the bounds within which a President may be left to work out a foreign policy").

appropriations it does make.[13]  But as the Executive Branch has repeatedly observed, "it does not necessarily follow that [Congress] may attach whatever condition it desires to an appropriation,"[14] for "Congress may not deploy [the spending power] to accomplish unconstitutional ends."[15]  The Supreme Court has affirmed this fundamental proposition on a number of occasions.  The most notable case is *United States v. Lovett*, 328 U.S. 303 (1946).  There, the Court expressly rejected the proposition that the appropriations power is "plenary and not subject to judicial review," and struck down as an unconstitutional bill of attainder a provision in an appropriations act that barred the payment of salaries to named federal employees.  *Id.* at 305, 307; *see also United States v. Klein*, 80 U.S. 128, 147-48 (1871) (deeming an appropriations proviso that "impair[ed] the effect of a [presidential] pardon" void as an unconstitutional "infring[ement]" on "the constitutional power of the Executive"); *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 435 (1990) (White, J., concurring) (noting that "the [majority] does not state that statutory restrictions on appropriations may never fall even . . . if they encroach on the powers reserved to another branch of the Federal Government").

Consistent with these precedents, the Executive Branch has long adhered to the view that "Congress cannot use the appropriations power to control a Presidential power that is beyond its direct control." *Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 267 (1996) (internal quotation marks omitted); *Mutual Security Program—Cutoff of Funds from Office of Inspector General and Comptroller*, 41 Op. Att'y Gen. 507, 530 (1960) (Att'y Gen. Rogers).[16]

---

[13]  *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."); *United States v. MacCollom*, 426 U.S. 317, 321 (1976) ("The established rule is that the expenditure of public funds is proper only when authorized by Congress . . . .") (citing *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1850)); *Authority of Congressional Committees to Disapprove Action of Executive Branch*, 41 Op. Att'y Gen. 230, 233 (1955) (Att'y Gen. Brownell) ("It is recognized that Congress may grant or withhold appropriations as it chooses, and when making an appropriation may direct the purposes to which the appropriation shall be devoted."); Memorandum for the Acting Solicitor General from John F. Davis, Office of Legal Counsel, *Re: Validity of Section 207 of Current Appropriation Act Providing That None of the Funds May be Used in the Santa Margarita Litigation* at 2 n.2 (June 26, 1953) ("The use of a rider to an appropriation act to control executive action is by no means novel.").

[14]  Memorandum for Charles W. Colson, Special Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* at 21 n.3 (May 22, 1970).

[15]  *Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 266 (1996); 41 Op. Att'y Gen. at 233 ("If the practice of attaching invalid conditions to legislative enactments were permissible, it is evident that the constitutional system of the separability of the branches of Government would be placed in the gravest jeopardy."); *Constitutionality of Proposed Legislation Affecting Tax Refunds*, 37 Op. Att'y Gen. 56, 61 (1933) (Att'y Gen. Mitchell) ("Congress may not, by conditions attached to appropriations, provide for a discharge of the functions of Government in a manner not authorized by the Constitution.  If such a practice were permissible, Congress could subvert the Constitution.").

[16]  The Supreme Court suggested in *South Dakota v. Dole*, 483 U.S. 203 (1987), that "the constitutional limitations on Congress when exercising its spending power" vis á vis the States "are less exacting than those on its authority to regulate directly." *Id.* at 209.  But the Court has since made clear that Congress does not enjoy such heightened latitude when it purports to impose spending conditions on the Executive Branch, for "*Dole* did not involve separation-of-powers principles." *Metro. Wash. Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 271 (1991); *see also* 16 Op. O.L.C. at 29 (*Dole* does not apply to spending conditions in the separation-of-powers context).

This proposition applies with equal force in the foreign affairs context.[17] Indeed, on numerous occasions, this Office has invoked the specific principle that "the spending power may not be deployed to invade core Presidential prerogatives in the conduct of diplomacy." *Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 197 (1996) (citing precedents for this principle from early 19th century involving objections to appropriations riders by Representative Daniel Webster, then-Secretary of State John Quincy Adams, and members of Congress); *see, e.g.*, supra page 9 & nn.12-13 (discussing memoranda and opinions). Section 7054, by purporting to use the appropriations power to enact a targeted restriction designed to dictate the form and manner through which the President may conduct the nation's diplomacy, is akin to these prior provisions.[18]

## V.

Accordingly, the Secretary would be justified in disregarding section 7054—and using funds appropriated in title I for the purpose of paying the expenses of delegations to U.N. entities chaired by terrorist list states.


/s/


DAVID J. BARRON
Acting Assistant Attorney General
Office of Legal Counsel

---

[17]   *See* 20 Op. O.L.C. at 266 ("'Congress may not use its power over appropriations of public funds to attach conditions to Executive Branch appropriations requiring the President to relinquish his constitutional discretion in foreign affairs.'") (internal quotation marks omitted) (quoting 16 Op. O.L.C. at 28, quoting 14 Op. O.L.C. at 42 n.3, quoting *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 261 (1989)).

[18]   Because there is no evidence that the Foreign Appropriations Act "without [section 7054] will not function 'in a *manner* consistent with the intent of Congress,'" section 7054 is "severable." 16 Op. O.L.C. at 29 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987)). Accordingly, section 7054's invalidity does not call into question the validity of any of the other provisions of the Act. *See* 20 Op. O.L.C. at 189 n. 21; 14 Op. O.L.C. at 44 ("Because the [unconstitutional] condition is severable, the President may enforce the remainder of the provision, disregarding the condition."); *cf. Memorial of Captain Meigs*, 9 Op. Att'y Gen. 462, 469-70 (1860) (Att'y Gen. Black) ("[I]f a condition . . . is void, it can have no effect whatever either upon the subject-matter or upon other parts of the law to which it is appended . . . .").